## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF MISSOURI, EASTERN DIVISION

| | | |
|---|---|---|
| CORNELL MCKAY | ) | |
| | ) | Cause No. 4:15-cv-01315-JAR |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| THE CITY OF ST. LOUIS, MISSOURI, | ) | |
| | ) | |
| JENNIFER JOYCE, in her individual and official capacities, | ) | |
| | ) | |
| ANTHONY BOETTIGHEIMER, in his individual and official capacities, | ) | |
| | ) | |
| CHRISTIAN STAMPER, in his individual and official capacities, | ) | |
| | ) | |
| DAVID RUDOLPH, in his individual and official capacities, | ) | |
| | ) | |
| RICHARD GRAY, THOMAS IRWIN, BETTYE BATTLE-TURNER, ERWIN O. SWITZER, in their official capacities as members of the St. Louis City Board of Police Commissioners, and MAYOR FRANCIS G. SLAY, in his official capacity as an ex-officio member of the St. Louis City Board of Police Commissioners, | ) | |
| | ) | |
| JOSEPH SPENCE, in his individual capacity, | ) | |
| | ) | |
| SUSAN RYAN, in her individual and official capacities, and | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| SC RYAN CONSULTING, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## SECOND AMENDED COMPLAINT
(42 U.S.C. § 1983, *Monell* Claim, Malicious Prosecution,
False Arrest, Civil Conspiracy, Defamation, Libel, and Slander)

1

Comes Now Plaintiff Cornell McKay, by his counsel, for his causes of action against the Defendants states as follows:

## INTRODUCTORY STATEMENT

1.      This is an action under 42 U.S.C. § 1983 arising out of the wrongful arrest, prosecution, and conviction of Plaintiff for First Degree Robbery and Armed Criminal Action.

2.      Detectives from the 9th District of the St. Louis Metropolitan Police Department deliberately framed Plaintiff to deflect blame from themselves and to cover up for their failure to investigate evidence in their possession that would have led to the apprehension of the person who murdered Megan Boken eight days later.

3.      Had they pursued known evidentiary leads, as did Homicide Detectives after the Boken murder, including the incoming and outgoing calls from the victim's cell phone, they would have identified Keith Esters as the perpetrator of the robbery and apprehended him before he shot and killed Megan Boken days later. Once it became evident that the ineptness of the 9th District's investigation of the robbery allowed Keith Esters to remain at large to commit additional crimes, law enforcement officers sought to charge a different suspect with the initial robbery.  Officers in the 9th District devised a conspiratorial scheme with the objective of framing Plaintiff Cornell McKay with the robbery and thereby covered up their failure to act in a timely manner. The circumstances of this cover up were known to the Circuit Attorney's Office in the precharging, investigative stage of the criminal process involving Plaintiff.

4.      Defendants formed this conspiracy to deliberately deny Plaintiff's due process rights which involved improperly suggestive identification procedures, falsification and fabrication of evidence, and preparation of false police reports.

5.      Prosecutors knowingly and willingly joined the conspiracy by covering up the unlawful acts of police and presenting known falsehoods to Plaintiff's jury and the trial court.

6.      Plaintiff's convictions were obtained only through the presentation of this false evidence and by concealing and suppressing evidence beneficial to Plaintiff's defense.

7.      Plaintiff's trial and conviction were determined by the Missouri Court of Appeals to have been the product of a "manifest injustice" warranting the reversal of the judgment.

8.      After the case had been remanded for a new trial, all charges against Plaintiff were dismissed.

## JURISDICTION AND VENUE

9.      This action is brought pursuant to 42 U.S.C. § 1983 and Missouri law to redress Defendants' tortious conduct and their deprivation of Plaintiff's rights secured by the U.S. Constitution.

10.      This Court has jurisdiction of Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction of his state-law claims pursuant to 28 U.S.C. § 1367.

11.      Venue is proper under 28 U.S.C. § 1391(b) as Plaintiff and the majority of Defendants reside in this judicial district, and the events and omissions giving rise to Plaintiff's claims occurred within this judicial district.

## PARTIES

12.      Plaintiff is a twenty-four year old African American male was a resident of the State of Missouri at all times pertinent hereto.

13.      Since 2000, Defendant Jennifer Joyce has been the duly elected Circuit Attorney for the City of St. Louis, Missouri. At all relevant times hereto, Defendant Joyce exercised final policymaking authority for the St. Louis Circuit Attorney's Office. At all times relevant hereto

she was acting under color of state law. She is sued in her individual and official capacities.

14.     Defendant Anthony Boettigheimer is a law enforcement officer employed by the St. Louis Metropolitan Police Department, the St. Louis City Board of Police Commissioners and/or the City of St. Louis. At all relevant times he was acting under color of state law within the scope of his employment. He is sued in his individual and official capacities.

15.     Defendant Christian Stamper is a law enforcement officer employed by the St. Louis Metropolitan Police Department, the St. Louis City Board of Police Commissioners, and/or the City of St. Louis. At all relevant times he was acting under color of state law within the scope of his employment. He is sued in his individual and official capacities.

16.     Defendant David Rudolph is a law enforcement officer employed by the St. Louis Metropolitan Police Department, the St. Louis City Board of Police Commissioners, and/or the City of St. Louis. At all relevant times he was acting under color of state law within the scope of his employment. He is sued in his individual and official capacities.

17.     Defendants Mayor Francis Slay, Bettye Battle-Turner, Richard H. Gray, and Erwin O. Switzer, and Thomas Irwin, are members of the St. Louis City Board of Police Commissioners who, as such, are responsible for establishing, overseeing, supervising, and otherwise employing the members, law enforcement officers and agents of the St. Louis Metropolitan Police Department. The St. Louis City Board of Police Commissioners has final policymaking authority for the St. Louis Metropolitan Police Department. They are sued in their official capacities as members of the Board. At all relevant times they were acting under color of state law within the scope of their employment.

18.     Defendant Joseph Spence at all relevant times was an employee of the Missouri Department of Probation and Parole and the State of Missouri. At all relevant times he was

4

acting under color of state law within the scope of his employment. Defendant Joseph Spence is sued in his individual capacity only.

19.     Defendant Susan Ryan was at all relevant times employed by SC Ryan Consulting, LLC, and acting within the scope of her employment. At all relevant times, Defendant Ryan acted as an official spokesperson of the St Louis Circuit Attorney's Office and was acting under color of state law. She is sued in her individual and official capacities.

20.     Defendant SC Ryan Consulting, LLC is a St. Louis, Missouri public relations consulting company owned and operated by Defendant Susan Ryan whose office is located in Ladue, Missouri. To Plaintiff's best knowledge and belief this Defendant was retained by the St. Louis Circuit Attorney's Office to provide public relations services. To the best of Plaintiff's knowledge and belief, this Defendant acted under color of state law along with state actors Jennifer Joyce and others to disseminate false public statements about Plaintiff designed to influence judicial decisions and damage Plaintiff's reputation. It is liable for the wrongful acts and omissions committed by Susan Ryan and its employees under the doctrine of respondeat superior.

21.     Defendant City of St. Louis is a municipality organized under the laws of the State of Missouri and is physically located in this judicial district. At all relevant times, the City of St. Louis was the employer of Defendants Boettigheimer, Stamper, Rudolph, Joyce, and non-party assistant circuit attorneys Steven Capizzi and Christine Krug. Defendant City of St. Louis is responsible for its customs, policies, and omissions in training that caused the deprivation of Plaintiff's constitutional rights. As of at least since September 1, 2013, the City accepted and assumed responsibility, ownership, and liability as successor-in-interest for contractual obligations, indebtedness, and other obligations of the St. Louis City Board of Police

Commissioners.

22.     On information and belief, the City of St. Louis procured an insurance policy that provided coverage for the misconduct of its agents and employees as alleged here.

23.     Defendants Boettigheimer, Stamper, and Rudolph engaged in the conduct complained of herein pursuant to the customs and/or policies of the City of St. Louis, the St. Louis Metropolitan Police Department, and/or the St. Louis Circuit Attorney's Office.

24.     Non-party assistant circuit attorneys Krug and Capizzi engaged in the conduct complained of pursuant to the customs and/or policies of the City of St. Louis, the St. Louis Circuit Attorney's Office, and/or St. Louis Metropolitan Police Department. At all relevant times they were acting under color of state law within the course and scope of their employment.

## FACTUAL BACKGROUND

### The August 10, 2012 Robbery

25.     On Friday, August 10, 2012 at approximately 8:45 P.M., a woman returning to her home on Boyle Avenue in the Central West End neighborhood of St. Louis was robbed at gunpoint of her cell phone and $50. (The robbery victim is referred to herein as "Jane Doe").

26.     Jane Doe described the perpetrator as a young, tall, slim, African-American male.

27.     Jane Doe's husband (hereinafter referred to as "John Doe") returned home from walking the family dog shortly after the robbery and immediately called 911.

28.     Detectives from the 9th District, St. Louis Metropolitan Police Department arrived at the scene, took a physical description of the robber and requested Jane Doe to leave her cell phone service activated because they were able to obtain investigative leads if the robber used her cell phone.

29.     Pursuant to that request Jane Doe did leave her phone activated.

30.     Call records would later establish that the robber began making calls from the phone minutes after the robbery, including a call 20-25 minutes later to one Kaylin Perry, the live-in girlfriend of an individual named Keith Esters.

31.     Between August 10 and August 18, 2012, at least 17 calls were made from the stolen cell phone to Perry's number.

32.     On August 13, 2012, Jane Doe executed a formal authorization allowing detectives in the 9th District to obtain all her cell phone records from Sprint.

33.     9th District detectives did not request call detail records directly from Sprint pursuant to either: (1) Jane Doe's authorization, (2) exigent circumstances; or (3) a subpoena.

34.     9th District detectives asked Jane Doe to download the call information from her Sprint account and email that information to them.

35.     On August 13, 2012, Jane Doe provided 9th District detectives with an Excel spreadsheet of calls purportedly made to and from her cell phone between August 10 and August 13, 2012. She subsequently provided at least one other Excel spreadsheet to 9th District detectives showing calls made to and from her phone through August 18, 2012.

36.     Jane Doe represented that she prepared the Excel spreadsheets using information she obtained by accessing her Sprint account online and that she downloaded a complete list of incoming and outgoing calls. However, the exhibits presented later at trial were, in fact, not complete.

37.     9th District Detectives knew that these phone numbers were in fact crucial investigative leads.

38.     After receiving the call records from Jane Doe, 9th District detectives took little or no action to investigate the phone numbers listed on the spreadsheet.

39.     At Plaintiff's criminal trial, the prosecution marked the Excel spreadsheets as Trial Exhibits 13 and 14, and the court admitted them into evidence at the prosecution's request. These spreadsheets are attached hereto as **Exhibit 1** (Trial Exhibit 13) and **Exhibit 2** (Trial Exhibit 14) and incorporated herein as if fully set forth.

40.     Trial Exhibit 13, which was falsely represented by police and prosecutors as containing a complete record of all calls to and from Jane Doe's phone between August 10 and August 13, 2012, appears as follows:

| DATE | TIME | PHONE | DESTINATION | MINUTES USED |
|---|---|---|---|---|
| 8/13/2012 | 2:08 PM | 314-438-8017 | LADUE,MO | 2 |
| 8/13/2012 | 12:44 PM | 314-373-0135 | Incoming, | 1 |
| 8/12/2012 | 5:29 PM | 314-373-0135 | LADUE,MO | 1 |
| 8/12/2012 | 3:33 PM | 314-373-0135 | LADUE,MO | 1 |
| 8/12/2012 | 3:28 PM | 314-373-0135 | Incoming, | 1 |
| 8/12/2012 | 2:43 PM | 314-373-0135 | LADUE,MO | 1 |
| 8/12/2012 | 2:17 PM | 314-373-0135 | Incoming, | 1 |
| 8/12/2012 | 2:12 PM | 314-456-2727 | LADUE,MO | 1 |
| 8/12/2012 | 12:52 PM | 314-373-0135 | Incoming, | 1 |
| 8/11/2012 | 11:28 PM | 314-373-0135 | Incoming, | 1 |
| 8/11/2012 | 11:26 PM | 314-373-0135 | Incoming, | 1 |
| 8/11/2012 | 11:26 PM | 314-373-0135 | LADUE,MO | 1 |
| 8/11/2012 | 11:25 PM | 314-373-0135 | LADUE,MO | 1 |
| 8/11/2012 | 11:15 PM | 314-373-0135 | LADUE,MO | 1 |
| 8/11/2012 | 11:07 PM | 314-373-0135 | Incoming, | 1 |
| 8/11/2012 | 9:51 PM | 314-373-0135 | LADUE,MO | 1 |
| 8/11/2012 | 9:51 PM | 314-373-0135 | LADUE,MO | 1 |
| 8/11/2012 | 9:50 PM | 314-373-0135 | LADUE,MO | 1 |
| 8/11/2012 | 9:49 PM | 314-373-0135 | LADUE,MO | 1 |
| 8/11/2012 | 11:04 AM | VoiceMail | | 1 |
| 8/10/2012 | 8:25 PM | 314-882-4543*** | LADUE,MO | 2 |

\*\*\*My last phone call made to my husband

41.     Except for one call to voicemail 14 hours after the robbery, Trial Exhibits 13 and 14 do not show any calls during the 25-hour period between 8:25 P.M. on August 10, 2012, when Jane Doe called her husband, and 9:49 P.M. the next day, August 11, 2012.

42.     Homicide detectives investigating the Boken murder subpoenaed Sprint for the call detail records for Jane Doe's phone.

43.     On or about September 19, 2012, Sprint's subpoena compliance department sent the official call records to Homicide Detective Enoch Chambers.

8

44.     The pertinent pages from the official Sprint records are attached hereto as **Exhibit 3** and incorporated herein as if fully set forth.

45.     The page from the Sprint records that shows the calls made to and from Jane Doe's phone immediately following the robbery appears as follows (arrows added by counsel):

1/2/2013 2:49 PM                          Call Records for PTN 3145047671                                      1 of 11

| CALLING_NBR | CALLED_NBR | DIALED_DIGITS | M_R_# | START_DATE | END_DATE | DURATION (SEC) | REPOLI_# | 1ST CELL | LAST CELL |
|---|---|---|---|---|---|---|---|---|---|
|  |  |  | Outbound | 8/10/12 11:07:39 | 8/10/12 11:07:39 | 0 | 512 | 0 | 0 |
|  |  |  | Inbound | 8/10/12 11:52:40 | 8/10/12 11:52:40 | 0 | 296 | 0 | 0 |
|  |  |  | Outbound | 8/10/12 12:27:28 | 8/10/12 12:27:28 | 0 | 506 | 0 | 0 |
|  |  |  | Inbound | 8/10/12 12:33:59 | 8/10/12 12:33:59 | 0 | 509 | 0 | 0 |
|  |  |  | Inbound | 8/10/12 17:29:44 | 8/10/12 17:29:44 | 0 | 515 | 0 | 0 |
|  |  |  | Outbound | 8/10/12 18:18:48 | 8/10/12 18:18:46 | 0 | 522 | 0 | 0 |
|  |  |  | Outbound | 8/10/12 18:18:59 | 8/10/12 18:19:32 | 33 | 70 | 20770 | 20770 |
|  |  |  | Routed_Call | 8/10/12 18:20:05 | 8/10/12 18:25:16 | 311 | 75 | 0 | 0 |
|  |  |  | Inbound | 8/10/12 18:20:09 | 8/10/12 18:25:19 | 310 | 70 | 20770 | 20023 |
|  |  |  | Outbound | 8/10/12 18:36:52 | 8/10/12 18:37:34 | 42 | 70 | 10005 | 10005 |
|  |  |  | Outbound | 8/10/12 18:38:10 | 8/10/12 18:38:46 | 36 | 70 | 10005 | 10005 |
|  |  |  | Routed_Call | 8/10/12 19:36:59 | 8/10/12 19:37:33 | 34 | 75 | 0 | 0 |
|  |  |  | Routed_Call | 8/10/12 19:36:59 | 8/10/12 19:37:33 | 34 | 75 | 0 | 0 |
|  |  |  | Undetermined | 8/10/12 19:37:03 | 8/10/12 19:37:32 | 29 | 70 | 0 | 0 |
|  |  |  | Inbound | 8/10/12 19:38:17 | 8/10/12 19:38:17 | 0 | 291 | 0 | 0 |
|  |  |  | Outbound | 8/10/12 20:25:34 | 8/10/12 20:25:43 | 9 | 70 | 20023 | 20023 |
|  |  |  | Outbound | 8/10/12 20:25:57 | 8/10/12 20:26:58 | 61 | 70 | 10005 | 10005 |
|  | (314) 504-7671 | (314) 504-7671 | Routed_Call | 8/10/12 20:46:25 | 8/10/12 20:47:05 | 40 | 75 | 0 | 0 |
|  | (6245000) 000-0022 | (314) 504-7671 | Routed_Call | 8/10/12 20:46:25 | 8/10/12 20:47:05 | 40 | 75 | 0 | 0 |
|  | (314) 504-7671 | (618) 530-9917 | Routed_Call | 8/10/12 20:46:29 | 8/10/12 20:47:04 | 35 | 70 | 0 | 0 |
| -9016 | (314) 504-7671 |  | Inbound | 8/10/12 21:07:39 | 8/10/12 21:07:39 | 0 | 291 | 0 | 0 |
| -9016 | (314) 504-7671 |  | Inbound | 8/10/12 21:07:40 | 8/10/12 21:07:40 | 0 | 506 | 0 | 0 |
| -9016 | (314) 504-7671 |  | Inbound | 8/10/12 21:07:41 | 8/10/12 21:07:41 | 0 | 506 | 0 | 0 |
| -9016 | (314) 504-7671 |  | Inbound | 8/10/12 21:07:42 | 8/10/12 21:07:42 | 0 | 506 | 0 | 0 |
| -9016 | (314) 504-7671 |  | Inbound | 8/10/12 21:07:43 | 8/10/12 21:07:43 | 0 | 506 | 0 | 0 |
| -9016 | (314) 504-7671 |  | Inbound | 8/10/12 21:07:44 | 8/10/12 21:07:44 | 0 | 506 | 0 | 0 |
| -9016 | (314) 504-7671 |  | Inbound | 8/10/12 21:07:45 | 8/10/12 21:07:45 | 0 | 506 | 0 | 0 |
| -9016 | (314) 504-7671 |  | Inbound | 8/10/12 21:07:46 | 8/10/12 21:07:46 | 0 | 506 | 0 | 0 |
| -9016 | (314) 504-7671 |  | Inbound | 8/10/12 21:07:47 | 8/10/12 21:07:47 | 0 | 506 | 0 | 0 |
| (314) 504-7671 | (314) 373-0135 | (1314) 373-0135 | Outbound | 8/10/12 21:10:16 | 8/10/12 21:10:27 | 11 | 75 | 20035 | 20035 |
| (314) 807-8575 | (6245000) 000-0022 | (314) 504-7671 | Routed_Call | 8/10/12 21:26:18 | 8/10/12 21:26:25 | 7 | 75 | 0 | 0 |
| -9016 | (314) 504-7671 |  | Inbound | 8/10/12 21:26:32 | 8/10/12 21:26:32 | 0 | 513 | 0 | 0 |
| (314) 283-9189 | (314) 504-7671 |  | Outbound | 8/11/12 8:07:09 | 8/11/12 8:07:09 | 0 | 532 | 0 | 0 |
| (314) 504-7671 | (314) 373-0135 | (1314) 373-0135 | Outbound | 8/11/12 10:31:41 | 8/11/12 10:31:53 | 12 | 75 | 30046 | 30046 |
| (314) 504-7671 | (314) 504-7671 | (314) 504-7671 | Inbound | 8/11/12 11:04:46 | 8/11/12 11:05:43 | 57 | 75 | 30046 | 30046 |
| (314) 504-7671 | (6245000) 000-0022 | (314) 504-7671 | Routed_Call | 8/11/12 11:04:46 | 8/11/12 11:05:43 | 57 | 75 | 30046 | 30046 |
| -9016 | (314) 504-7671 |  | Inbound | 8/11/12 11:05:12 | 8/11/12 11:05:12 | 0 | 297 | 0 | 0 |

SPRINT NEXTEL CORPORATION
CDMA Network

46.     The official Sprint records indicated that the stolen phone was used to call Kaylin Perry at 9:16 P.M. on August 10, 2012, some 20-25 minutes after the robbery, and to call Perry at 10:31 P.M., 45 minutes later (indicated above by the arrows). These calls and other calls were not reflected on the Excel spreadsheets the prosecution introduced into evidence against Plaintiff at his trial.

### The Murder and Attempted Robbery of Megan Boken on August 18, 2012

47.   On August 18, 2012, Keith Esters shot and killed Megan Boken when she refused to give him her cell phone.

48.   The attempted robbery of Boken occurred on a Saturday afternoon in the Central West End approximately 2 ½ blocks from the scene of Jane Doe's robbery.

49.   Boken, a well-known former volleyball star at St. Louis University, was in town to visit friends and family.

50.   Her murder immediately gained national and local media attention.

51.   Shortly after the murder, a member of Defendant Slay's staff, using the social media platform known as Twitter, publicly "tweeted" that Boken and her assailant "appear to have known each other," implying that Boken had asked for this trouble by associating with Keith Esters, an assertion which was false and unfounded as Boken neither knew nor had ever encountered Esters before.

52.   In response to complaints from the Boken family, Defendant Slay issued a public apology for the tweet.

53.   The Homicide Division of the St. Louis Metropolitan Police Department, including Homicide Detective Jerone Jackson, handled the Boken murder investigation.

54.   On August 19, 2012, Homicide detectives ran a computer search from which they learned of the Jane Doe robbery on August 10 and learned that it took place in the same neighborhood as the Boken robbery on August 18, 2012.

55.   On August 19, 2012, Homicide detectives contacted the 9th District for information about the Jane Doe robbery.

56.   On Monday, August 20, 2012, 9th District Detective Sgt. Christian Stamper

10

arrived at the Homicide division and met with Homicide detectives at 9 A.M.

57.     Homicide detectives requested information about the Jane Doe robbery from Stamper, and Stamper said he would contact the detectives handling that investigation and have them contact Homicide detectives.

58.     Before being contacted by Homicide detectives, Stamper and other 9th District detectives, including Defendants Boettigheimer and Rudolph, had reason to believe and suspect that Esters had committed both the Boken and Jane Doe crimes by virtue of similar methods of operation, geographical proximity, and similarity of the description of the suspect and the weapon used.

59.     At that time, Stamper and others knew that 9th District detectives had done little or nothing to investigate the Jane Doe robbery.

60.     Stamper grew concerned that the 9th District's inaction in response to the Jane Doe robbery would damage the reputation of the district specifically and the St. Louis Metropolitan Police Department in general, cause professional embarrassment, provide grounds for disciplinary action against one or more detectives, and expose the City of St. Louis to civil liability.

## The Parallel Investigations of Homicide and the 9th District

61.     On August 20, 2012, Defendant Stamper assigned Defendant Anthony Boettigheimer to the Jane Doe robbery case when Boettigheimer reported to work.

62.     Stamper directed Boettigheimer to contact Homicide detectives handling the Boken case regarding his investigation of the Jane Doe robbery.

63.     Boettigheimer later claimed he utilized phone numbers appearing on the Excel spreadsheets provided by Jane Doe to perform a computerized search of a database known as

"the Crime/Matrix" from which he derived addresses of potential suspects.

64.     Based on the results of this purported search of the Crime/Matrix, Boettigheimer claimed that he ultimately focused on the phone number and address of one Lamont Carter.

65.     Boettigheimer claimed that when he entered Carter's address, the Crime/Matrix generated a list of 15 to 20 persons who had had some association with Carter's address.

66.     Boettigheimer claimed Plaintiff's name appeared on the list generated by the Crime/Matrix.

67.     Boettigheimer claimed Plaintiff was the only person on that list who matched the physical description given by Jane Doe.

68.     Boettigheimer admitted he did not document or preserve any record of the alleged computer search.

69.     This failure violated applicable professional standards which require documentation of all such investigative activities.

70.     This failure to document this crucial investigative action was known and approved by Defendant Stamper and Defendant Joyce and Assistant Circuit Attorneys Capizzi and Krug.

71.     Despite his knowledge that he was to contact Homicide detectives about the Jane Doe robbery investigation, without first notifying Homicide detectives, Boettigheimer placed a wanted alert for Plaintiff and got word of such to Plaintiff's relatives.

72.     On the morning of August 21, 2012, Plaintiff turned himself in at the 9th District station, having been brought there from Washington, Missouri, by his friend and mentor Reverend Chris Douglas.

73.     Boettigheimer and others began to question Plaintiff about the Jane Doe robbery

12

and the Boken murder, but became frustrated when Douglas produced an alibi for the Boken murder (Plaintiff was in Washington, Missouri with members of Douglas' church).

74.     Douglas also brought to the 9th District station three witnesses from St. Louis who were prepared to tell the detectives that they were at a convenience store with Plaintiff when Jane Doe was robbed.

75.     Boettigheimer and the other 9th District detectives scoffed at Douglas and refused to interview the proffered alibi witnesses.

76.     Having still not contacted Homicide detectives, Boettigheimer arranged for Jane Doe and her husband to view a photo spread containing a photo of Plaintiff on the evening of August 21, 2012. Jane Doe identified Plaintiff's photo but her husband did not.

77.     Following Jane Doe's identification of Plaintiff's photo, 9th District detectives finally contacted Homicide detectives regarding the investigation.

78.     9th District detectives concealed their lack of investigative efforts prior to Boken's murder by not contacting Homicide detectives until after an ostensible suspect in the Jane Doe robbery had been identified.

79.     On the morning of August 22, 2012, Boettigheimer arranged a live lineup at which Plaintiff was identified as the perpetrator by Jane and John Doe.

80.     While Boettigheimer was focusing on his Crime/Matrix search, Homicide Detectives, having obtained the Excel spreadsheets purportedly prepared by Jane Doe, called each of the phone numbers listed.

81.     On August 22, 2012, and within hours of beginning to call the phone numbers on the Excel Spreadsheet, Homicide detectives were able to contact, locate, and apprehend Kaylin Perry.

82.     Also on August 22, 2012, under questioning by Homicide detectives, Perry implicated her boyfriend, Keith Esters, in both the Jane Doe robbery and the Boken murder, stating that Esters had admitted to her that he had committed both crimes. She also provided other facts and information corroborating Esters' admissions to her, including that he told her that he had robbed a white woman of a cell phone and $50, the same items taken from Jane Doe.

83.     On August 23, 2012, Esters was taken into custody by Homicide detectives and confessed to the Boken murder.

### The Homicide Division Warned the 9th District They Have the Wrong Man

84.     While being questioned by Detective Jerone Jackson, Esters stated that he was at the scene of the Jane Doe robbery, knew who committed the robbery, and knew that the perpetrator was not Cornell McKay.

85.     After questioning Esters and reviewing other evidence he had gathered, Jerone Jackson warned 9th District detectives that they had apprehended the wrong man for the Jane Doe robbery and urged them to interview Kaylin Perry and to investigate Lamont Carter because Perry had indicated that Carter had sold Esters the handgun used in both crimes and that the three of them (Perry, Esters, and Carter) lived together from time to time.

86.     During this time period, other detectives in the Homicide Division, including Detective Tracey Chaney, told 9th District detectives that they were pursuing the wrong man.

87.     9th District detectives, including Defendants Boettigheimer, Stamper, and Rudolph, ignored these warnings and the information Detective Jackson provided that clearly and directly connected Esters to both crimes.

88.     Despite the specific warnings of Homicide detectives, 9th District detectives did not expand the investigation of the Jane Doe robbery beyond Plaintiff and sought and obtained

official charges against Plaintiff Cornell McKay for the Jane Doe robbery.

89.     Despite knowing of facts incriminating Esters, before indicting Plaintiff, 9th District detectives and prosecutors failed to have Jane Doe view a photospread and lineup containing Esters.

90.     Although 9th District detectives and the Circuit Attorney's Office learned of the official Sprint records before Plaintiff's trial, the prosecution decided to rely on the Excel spreadsheets and introduced them into evidence against Plaintiff, thereby giving the jury the false impression that Jane Doe's phone was not used to call Kaylin Perry until 25 hours after the robbery and that Plaintiff had plenty of time to transfer the phone to Esters.

91.     Based on the documented circumstances, there is a plausible inference that 9th District detectives deliberately omitted numerous calls to and from Jane Doe's phone from the Excel spreadsheets, including the call made to Kaylin Perry's cell phone 20-25 minutes after the robbery.

92.     Assistant Circuit Attorney Capizzi knew and approved of the conduct of 9th District detectives in preparing false and incomplete cell phone records which indicated that the first call to Kaylin Perry was made 25 hours after the robbery, instead of 20-25 minutes after the robbery.

93.     9th District Detectives, including Boettigheimer, and Defendant Joyce and Assistant Circuit Attorneys Capizzi and Krug knew the Excel spreadsheets did not accurately set forth the incoming and outgoing calls of Jane Doe's cell phone because they had obtained the official Sprint call records.

94.     9th District detectives and the prosecution elected to rely on the incomplete Excel spreadsheets to prosecute Plaintiff because they allowed them to advance a strategy of

prosecution that Plaintiff would have had ample time to transfer or sell the stolen phone to Esters, whereas the fact that a call was made to Esters' girlfriend some 20-25 minutes later would render such a theory absurd.

95.    Co-conspirators Steven Capizzi and Christine Krug adopted and carried out this strategy to keep the jury from hearing about the call to Perry immediately after the robbery by successfully objecting to the official Sprint call records, which defense counsel offered as Trial Exhibit H, on grounds they knew were directly contrary to black letter law found in *State v. Patton*, 419 S.W.3d 125, 129 (Mo.App. E.D.2013), a case which directly emanated from the trial work of the St. Louis Circuit Attorney's Office, including Assistant Circuit Attorney Krug.

96.    The Circuit Attorney's Office had taken a position contrary to the one advanced in Plaintiff's trial in other cases where prosecutors had argued that cell phone records were admissible without expert testimony. *See, e.g., State v. Patton,* No. 1022-CR02048 (Mo.Cir.Ct. St. Louis City), *aff'd* 419 S.W.3d 125, 129 (Mo.App. E.D.2013)*; State v. Williams*, 1022-CR06040 (Cir. Ct. St. Louis City), *aff'd* Case No. ED98968 (Mo.App. E.D.2013). In *Williams* and *Patton*, the Circuit Attorney's Office argued that call records furnished by the cellular carrier pursuant to a business records subpoena were admissible without expert testimony just as Plaintiff argued at his trial. However, when McKay attempted to introduce authenticated Sprint call records, the prosecution successfully kept the records out of evidence by arguing that they were inadmissible without expert testimony.

97.    The prosecution deliberately deceived the jury by presenting the false version of the call history of Jane Doe's cell phone and thereby violated Plaintiff's right to due process.

98.    This conduct directly and intentionally violated Rule 4-3.3 of the Missouri Rules of Professional Conduct which requires candor toward the tribunal and prohibits a lawyer from

offering evidence he knows to be false or to object to evidence knowing the objection is based on a misstatement of law.

99.    By successfully excluding the official Sprint records at Plaintiff's trial, the prosecution was able to present and argue a false version of the facts regarding the calls made from Jane Doe's phone after the robbery and prevented Plaintiff from challenging the thoroughness of the criminal investigation and from effectively cross-examining Jane Doe as to the completeness of the call logs she prepared and sent to 9th District detectives.

## EVIDENCE OF PLAINTIFF'S INNOCENCE IGNORED

100.    Defendants Boettigheimer, Rudolph, and Stamper deliberately ignored evidence of Plaintiff's innocence, as exhibited by the following acts and omissions:

a.    Ignored the fact that the stolen phone was used to call Kaylin Perry, Esters' girlfriend, 20-25 minutes after the robbery;

b.    Refused to interview Plaintiff's alibi witnesses. Shortly after Plaintiff's arrest, Reverend Chris Douglas brought three alibi witnesses to the 9th District Station and suggested to Defendants Stamper, Boettigheimer, and/or Rudolph that they interview them. In refusing to interview the witnesses, one of those Defendants stated: "You might as well have brought us Bozo the Clown," thereby exhibiting bad faith and malicious intent and demonstrating complete and conscious disregard for the ascertainment of the truth;

c.    Refused to interview Lamont Carter, who Homicide detectives determined was an associate of Keith Esters and had sold him the gun used in both crimes, despite the urging of Homicide detectives;

17

d.      Ignored the admissions of Esters' girlfriend, Kaylin Perry, that Esters

confessed to her that he obtained the stolen phone and $50 by robbing a

white woman in the Central West End;

e.      Performed an incomplete and inaccurate interview of Perry;

f.      Falsely reported that Perry knew nothing about the Jane Doe robbery;

g.      Ignored that Esters' physical appearance resembled that of the perpetrator

of the Jane Doe robbery;

h.      Ignored the use of a similar small silver handgun in the Jane Doe robbery

and the crimes committed by Esters;

i.      Ignored the fact that hidden clothing seized by Homicide Detectives from

the residence of Perry and Esters matched Jane Does' description of the

clothing worn by her assailant;

j.      Ignored Esters' admissions to Homicide Detectives in which he placed

himself at the scene of the robbery, admitted he knew who committed the

robbery, and knew the perpetrator was not Plaintiff;

k.      Ignored the fact that Esters sold the victim's phone the day after the Boken

murder;

l.      Ignored the fact that Esters committed a similar cell phone armed robbery

of a woman in Brentwood, Missouri on August 12, 2012;

m.      Ignored the fact that the phone number of Esters's girlfriend Kaylin Perry

was called using Jane Doe's cell phone 20-25 minutes after the robbery;

n.      Made no investigative effort and prepared no reports about calls made to

and from Jane Doe's cell phone immediately after the robbery.

**The Conspiracy to Deny Plaintiff's Constitutional Rights**

101.    In deciding to pursue charges against Plaintiff, 9th District detectives, including Boettigheimer, Stamper, and Rudolph, agreed and had a meeting of the minds with each other and with Joseph Spence, Jennifer Joyce, the Circuit Attorney, Steven Capizzi and Christine Krug, who were prosecutors in the St. Louis Circuit Attorney's Office, and with Susan Ryan (the hired, official spokesperson of the St. Louis Circuit Attorney's Office), to enter into a conspiracy to frame Plaintiff for the Jane Doe robbery, to wrongfully and maliciously obtain his conviction for that crime, and to publicly justify their actions and divert attention from the misconduct of law enforcement officials by disseminating false information about Plaintiff's involvement in the robbery

102.    Overt acts in furtherance of the conspiracy include the following:

    a.      Conducting a sham investigation with no attempt to ascertain the truth;

    b.      Relying on the call logs furnished by the victim instead obtaining the call detail logs directly from Sprint;

    c.      Failing to request the call detail records from Sprint by utilizing Jane Doe's written authorization;

    d.      Failing to seek the call detail records from Sprint on an emergency basis following the robbery;

    e.      Failing to subpoena the call detail records from Sprint following the robbery;

    f.      Continuing to rely on the incomplete call information on Excel spreadsheets to prosecute Plaintiff after receiving the official call records that Sprint provided to the Homicide Division;

g.    Utilizing highly suggestive and improper identification procedures designed to produce a seemingly reliable eyewitness identification of Plaintiff characterized by the following:

    i.    Suggesting to the victim that they may have a suspect in custody before showing her a photo spread and a lineup;

    ii.    Failing to show the victim a photo spread or lineup containing a photograph of Keith Esters during the early stages of the investigation, despite their knowledge of Esters' admissions to committing the robbery and substantial corroborating evidence implicating in, and directly connecting him, to the crime;

    iii.    Conducting a highly suggestive identification procedure 6 months later when they showed Jane Doe a picture of Esters for the first time. Krug and/or Capizzi had informed Boettigheimer that the defense was raising an issue of misidentification and the existence of an alternative perpetrator, i.e., Esters.

    iv.    Acting on the prosecution's prompting, before showing Esters' photo to Jane Doe, Boettigheimer told Jane Doe that her cell phone had been transferred to someone else after the robbery and that Cornell McKay was an "associate" of Keith Esters. There was no evidence Plaintiff and Esters were associated, and Boettigheimer intentionally misinformed Jane Doe that there was such an association in an effort to convince Jane Doe that her previous identification of Plaintiff was correct and to get her to ratify that identification.

v.   Boettigheimer knew that McKay and Esters were not associates as he admitted in his deposition testimony.

h.   Boettigheimer prepared false police reports, including one which contained a purported "synopsis" of the information from Kaylin Perry, which inaccurately and untruthfully contained the assertion that Perry knew nothing about the Jane Doe robbery.

i.   Despite knowing that a person other than Plaintiff was the perpetrator of both crimes, Capizzi agreed to and performed another act in furtherance of the conspiracy to frame Plaintiff by seeking formal criminal charges against Plaintiff for the Jane Doe robbery based on evidence he knew or should have known was false.

j.   Capizzi and co-conspirator Joseph Spence knowingly presented false information to Plaintiff's probation judge stating that Cornell McKay's photo appeared on Jane Doe's stolen phone when, in fact, his photo was not on the phone. In his probation violation report, Defendant Spence falsely summarized the police report by stating: "On the [victim's] phone were pictures of an individual that was not known to the victim/cell phone owner. Police were able to identify the individual in the pictures as MCKAY." No police report states that Cornell McKay's photograph was on the victim's cell phone.

k.   Defendant Spence and co-conspirator Capizzi utilized the false information recited in Spence's report to argue for an enhanced bond. In reliance on the evidence presented, the probation judge set bond at

21

$150,000 which was twice as high as the bond in the robbery case. Plaintiff's inability to post bond in this higher amount insured his incarceration during the pendency of the robbery charge.

l.  Despite their specific knowledge that the robbery of Jane Doe could not possibly have occurred until at least 34 minutes AFTER sundown, Krug and Capizzi throughout Plaintiff's trial repeatedly presented statements, arguments, and testimony to the court and to the jury that the robbery occurred BEFORE sundown;

m.  Falsifying Jane Doe's Excel spreadsheet of incoming and outgoing calls to eliminate the first 15 hours of calls made after the robbery, including the call made to Esters' girlfriend 20-25 minutes after the robbery.

n.  In furtherance of the conspiracy Capizzi and Krug utilized the falsified Excel spreadsheets to argue that, because the first call to Esters' girlfriend did not appear until 25 hours AFTER the robbery, Plaintiff would have had plenty of time to sell or transfer the phone to Esters after the robbery, whereas this argument would not have been credible if Jane Doe's phone was used to call Esters' girlfriend minutes after the robbery. They knew that the Excel spreadsheets were incomplete and inaccurate.

o.  The official Sprint call records, which Defendants had knowledge and possession of, clearly contradicted the prosecution's theory, evidence, and arguments. Krug and Capizzi successfully objected and argued to keep the truth contained in these records from the jury on the basis of a legal theory which they knew to be unsustainable under controlling legal authority.

22

p.     Failing to preserve critical exculpatory and/or impeachment evidence which would have cast serious doubt on the viability, credibility, motives, and integrity of the investigation and prosecution of Plaintiff, including Jane Doe's cell phone which, while in possession of the State, was purportedly damaged to such an extent that no information could be retrieved from it).

q.     In furtherance of the conspiracy, Krug deliberately misled Plaintiff's defense attorney by representing that data downloaded from Jane Doe's cell phone could not be provided to him on a CD.

r.     Ryan, Joyce, Capizzi, and others engaged in a public relations campaign to convince the public of Plaintiff's guilt by deliberately disseminating false information both before and after Plaintiff's conviction was vacated and dismissed in order to convey the false image that they had properly and honestly convicted Plaintiff and that Plaintiff was guilty.

s.     All Defendants endeavored to cover up and conceal the fabrication of evidence, the unconstitutional identification procedures, and all other conspiratorial acts alleged herein.

103.    Through their conspiratorial efforts, Defendants were able to obtain felony convictions for first-degree robbery and armed criminal action for which Plaintiff received a sentence of 12 years' imprisonment.

104.    After Plaintiff had served 2 years and 9 months of that sentence, the Missouri Court of Appeals reversed the judgment on the grounds that the trial proceedings had constituted a manifest injustice and remanded the case to the circuit court for a new trial.

105.    Defendants Joyce and Ryan and non-party Capizzi, as part of the conspiracy and to cover up Plaintiff's wrongful prosecution and conviction, made public statements in local media to give the false impression that police and prosecutors had arrested and prosecuted the correct suspect for the Jane Doe robbery even though they knew that Plaintiff was innocent and that his prosecution had been based on false and fabricated evidence.

106.    On May 6, 2015 and thereafter, in announcing that the charges against Plaintiff had been dismissed, Defendant Jennifer Joyce made public statements that police and prosecutors had no doubt that Plaintiff committed the Jane Doe robbery even though she knew that Plaintiff had been wrongfully framed and convicted for a crime he did not commit. Defendant Joyce thereby exhibited an intentional or reckless disregard for the truth.

107.    As policy-making officials of the Defendant City of St. Louis, Defendants Joyce, Slay, Gray, Battle-Turner, Switzer, and Irwin ratified and adopted the unconstitutional conduct of Defendants Boettigheimer, Rudolph, Stamper, Joyce, and Ryan and co-conspirators Capizzi and Krug, thereby making their conduct the official policy or custom of the City of St. Louis and the St. Louis Metropolitan Police Department.

108.    On September 9, 2014, Plaintiff filed a motion to set aside his plea of guilty to probation violation in the Circuit Court of the City of St. Louis.

109.    On May 7, 2015, the Circuit Court set aside Plaintiff's probation revocation and sentence, reinstated Plaintiff's probation, and ordered that he be "released forthwith on personal recognizance."

110.    On May 15, 2015, the Circuit Court entered an order discharging Plaintiff from probation.

## DAMAGES

111.     As a result of the Defendants' unconstitutional conduct, Plaintiff spent nearly 3 years incarcerated for crimes he did not commit. He was deprived of educational and vocational opportunities, and suffered a severe loss of past and future income and diminished earning capacity. He was forced to suffer indescribable assaults to his person, mental anguish, emotional pain, separation from his family and friends, and was forced to live in an environment where he risked being assaulted on a regular basis. He was deprived of the normal enjoyments of his life, from age 20 through age 23, in that he was unable to be married or have complete relations with members of the opposite sex, start and raise a family of his own or pursue a meaningful and gainful career. He was, instead, forced to live in a hopeless and confined environment not knowing if he would ever get out of prison alive.

112.     Plaintiff's damages include, but are not limited to, past and future income loss, loss of economic opportunities and earning capacity, attorney's fees, legal expenses, and court costs which were expended to contest the false charges and convictions, loss of enjoyment of life, emotional distress, mental anguish, humiliation, loss of freedom, and loss of reputation.

## COUNT I

### 42 U.S.C. § 1983

**Destruction and/or Suppression of Exculpatory Evidence
(5th and 14th Amendments, Procedural Due Process)**

**(Against Defendants Boettigheimer, Rudolph, and Stamper)**

113.     Plaintiff hereby incorporates each of the allegations of this Complaint as if fully set forth herein.

114.     As more fully set forth above, throughout the investigation of Plaintiff, Defendants Boettigheimer, Rudolph, and Stamper concealed and suppressed exculpatory and impeaching evidence in violation of Plaintiff's fundamental right to Due Process. This includes,

but is not limited to, the suppression of evidence described herein.

115.   Defendants Boettigheimer, Rudolph, and Stamper suppressed the following exculpatory and impeaching evidence:

> a.   Calls made on Jane Doe's stolen phone immediately after the robbery which implicated and established a direct connection to an alternative perpetrator;
>
> b.   The seized Jane Doe phone. The alleged damage or destruction of the phone prevented its examination by defense experts prior to trial;
>
> c.   Their highly suggestive behavior designed to elicit a misidentification of Plaintiff as the perpetrator;
>
> d.   Neighborhood surveillance videos;
>
> e.   Text messages appearing on the stolen phone which would have implicated and established a direct connection to an alternative perpetrator;

116.   As policy-making officials of the Defendant City of St. Louis, Defendants Joyce, Slay, Gray, Battle-Turner, Switzer, and Irwin ratified and adopted the unconstitutional suppression of evidence by Defendants Boettigheimer, Rudolph, and Stamper, and co-conspirators Capizzi and Krug, thereby making their conduct the official policy or custom of the City of St. Louis and the St. Louis Metropolitan Police Department.

117.   The acts and omissions described herein violated Plaintiff's right to procedural due process and a fair trial, as guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the U.S. Constitution, were done in bad faith and with the intent to deprive him of a fair trial and to prevent him from ever obtaining legal relief.

118.    The acts and omissions of each Defendant named in this Count were the direct, legal, and proximate cause of Plaintiff's injuries, harms, and losses as described herein.

119.    If Plaintiff prevails, he is entitled to an award of attorney fees and costs pursuant to 42 U.S.C. § 1988.

## COUNT II

### Fabrication of Evidence
### (14th Amendment—Substantive Due Process)

### (Against Defendants Boettigheimer, Rudolph, Stamper, and Spence)

120.    Plaintiff hereby incorporates each of the allegations of this Complaint as if fully set forth herein.

121.    As more fully set forth above, throughout the investigation of Plaintiff, Defendants Boettigheimer, Rudolph, Stamper, and Spence fabricated evidence, including, but not limited to, the following:

      a.    Boettigheimer and others improperly "coached" Jane Doe and her husband to erroneously identify Plaintiff;

      b.    Boettigheimer, Rudolph, or Stamper (or two or more of them acting in concert) fabricated the Excel spreadsheets by omitting crucial early calls made by the perpetrator using Jane Doe's stolen phone;

      c.    Defendant Spence prepared and filed with the Court a fabricated probation revocation report containing untruthful information that photographs of Plaintiff appeared on the victim's stolen phone.

122.    As policy-making officials of the Defendant City of St. Louis, Defendants Joyce, Slay, Gray, Battle-Turner, Switzer, and Irwin ratified and adopted the fabrication of evidence by Defendants Spence, Boettigheimer, Rudolph, Stamper, and co-conspirators Capizzi and Krug,

thereby making their conduct the official policy or custom of the City of St. Louis and the St. Louis Metropolitan Police Department.

123.     The acts and omissions described herein were committed with deliberate indifference to Plaintiff's constitutional rights and violated his right to due process.

124.     The fabrication of evidence and testimony resulted in the initiation and continuation of wrongful criminal proceedings against Plaintiff and his nearly three years of wrongful incarceration for crimes he did not commit.

125.     The acts and omissions of each of the Defendants named in this Count were the direct, legal, and proximate cause of Plaintiff's injuries, harms, and losses as described herein.

<u>**COUNT III**</u>

**42 U.S.C. § 1983**
**Reckless or Intentional Failure to Investigate**
**(14th Amendment – Substantive Due Process)**

**(Against Defendants Boettigheimer, Rudolph, Stamper, and Spence)**

126.     Plaintiff hereby incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

127.     As more fully set forth above, throughout the investigation and the trial, Defendants Boettigheimer, Rudolph, and Stamper recklessly and/or intentionally failed to conduct a fair, good-faith, thorough and complete investigation that would have resulted in criminal charges of the known, actual perpetrator of these crimes instead of Plaintiff.

128.     The Defendants named in this Count purposefully ignored evidence establishing Plaintiff's innocence and ignored physical evidence and witness statements that directly connected Keith Esters to the robbery of Jane Doe.

129.     This evidence included:

a.     the failure and refusal to follow up on witnesses who provided a substantial and legitimate alibi for Plaintiff. (By the time prosecutors and their investigators conducted a perfunctory interview of alibi witnesses (weeks after charges were filed), they had already made up their minds to pursue criminal charges against Plaintiff to conclusion);

b.     the failure and refusal to call the telephone numbers appearing on Jane Doe's Excel spreadsheet;

c.     the failure and refusal to conduct a meaningful identification process by showing Jane Doe and John Doe a photo spread or line-up containing Keith Esters during the early stages of the investigation even though he was in custody at the St. Louis Justice Center and available to 9th District detectives from the time of his arrest in August 2012 until the conclusion of Plaintiff's trial.

130.    Defendant Spence deliberately or recklessly failed to investigate the facts before filing an erroneous and false probation revocation report which served the dual purposes of having Plaintiff's probation on a prior offense revoked wrongfully, as well as justifying an unreasonably high bond which ensured that Plaintiff would not be released while the robbery charge was pending.

131.    As policy-making officials of the Defendant City of St. Louis, Defendants Joyce, Slay, Gray, Battle-Turner, Switzer, and Irwin ratified and adopted the fabrication of evidence by Defendants Spence, Boettigheimer, Rudolph, Stamper, and co-conspirators Capizzi and Krug, thereby making their conduct the official policy or custom of the City of St. Louis and the St. Louis Metropolitan Police Department.

132.     The actions and omissions described herein were committed with deliberate indifference to Plaintiff's constitutional rights.

133.     The malicious intent exhibited by this failure to investigate or to deliberately pursue the wrong leads and evidence caused the initiation and continuation of criminal charges against Plaintiff despite Defendants' knowledge of his innocence of the crimes.

134.     The acts and omissions of each of the Defendants named in this Count were the direct, legal, and proximate cause of Plaintiff's injuries, harms, and losses as described herein.

135.     If Plaintiff prevails, he is entitled to an award of attorney fees and costs pursuant to 42 U.S.C. § 1988.

## COUNT IV

### 42 U.S.C. § 1983

### Conspiracy to Deprive Constitutional Rights

### (Against Defendants Boettigheimer, Rudolph, Stamper, Spence, Joyce, and Ryan)

136.     Plaintiff incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

137.     As more fully set forth above, Defendants Boettigheimer, Rudolph, Stamper, Spence, Joyce, and Ryan and non-party co-conspirators Capizzi and Krug had a meeting of the minds and, beginning on or about August 18, 2012, there existed an agreement between two or more of them to commit at least one unlawful act to bring about the wrongful arrest, prosecution, conviction, and incarceration of Plaintiff.

138.     Each of the above-named defendants became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it.

139.     One or more of the members of the conspiracy performed overt acts on or after

30

August 18, 2012 for the purpose of carrying out the conspiracy, as set forth above. These acts included the dissemination of false and defamatory public statements through the media that Plaintiff was guilty when it was known that he was not.

140.    In committing these overt acts the Defendants conspired to cause the initiation and continuation of a prosecution devoid of probable cause or factual basis against Plaintiff.

141.    The purpose of the conspiracy was to frame Plaintiff for the Jane Doe robbery in order to deflect blame and attention from 9th District detectives. The initiation of an effective and expeditious investigation of the Jane Doe robbery would have resulted in the apprehension of Keith Esters before he could have killed Boken. This is demonstrated by the speed in which Homicide detectives solved the case after they investigated the phone numbers known to have called by or been called with Jane Doe's cell phone.

142.    The conspiracy also contemplated the dissemination of false and defamatory public statements that there was no doubt of Plaintiff's guilt in order to publicly justify the Defendants' wrongful actions and omissions.

143.    The acts and omissions described herein were committed with deliberate indifference to Plaintiff's constitutional rights.

144.    The acts and omissions described herein caused the initiation and continuation of the prosecution of Plaintiff despite his known and obvious innocence.

145.    The acts and omissions of each of the Defendants named in this Count were the direct, legal, and proximate cause of Plaintiff's injuries, harms, and losses as described herein.

146.    If Plaintiff prevails, he is entitled to an award of attorney fees and costs pursuant to 42 U.S.C. § 1988.

## COUNT V

31

**42 U.S.C. § 1983**
*Monell*
**(14th Amendment – Procedural/Substantive Due Process)**

**(Against Defendants City of St. Louis, Joyce, Slay,
Battle-Turner, Irwin, Switzer, and Gray)**

147.    Plaintiff incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

148.    The St. Louis City Board of Police Commissions, acting through its members Defendants Slay, Battle-Turner, Irwin, Switzer, and Gray, had final policymaking authority for the City of St. Louis regarding the customs, rules, practices, and policies that govern the investigators and officers in the 9th District of the St. Louis Metropolitan Police Department.

149.    Defendant Joyce had final policymaking authority for the City of St. Louis regarding customs, rules, practices, and policies that govern prosecutors in the St. Louis Circuit Attorney's Office, including co-conspirators Krug and Capizzi, in the collection and preservation of evidence and the production of *Brady* material to the accused.

150.    Defendant Joyce under Section 56.450 RSMo has final policymaking authority for the City of St. Louis regarding the management and conduct of all criminal cases over which the Circuit Court of the City of St. Louis has jurisdiction.

151.    Defendant Joyce knew of the investigative efforts of law enforcement officials, of the actions of the Assistant Circuit Attorneys in prosecuting Plaintiff, and of the evidence introduced and excluded at trial.

152.    Defendants City of St. Louis, through Joyce, Slay, Battle-Turner, Irwin, Switzer and Gray, adopted, implemented, enforced, and/or tolerated and/or assented to policies, practices, and customs which operated to deprive Plaintiff of his constitutional rights.

153.    Defendants City of St. Louis, through Joyce, Slay, Battle-Turner, Irwin, Switzer,

32

and Gray, knew or should have known of the unconstitutional activities of Defendants Spence,

Ryan, Boettigheimer, Rudolph, and Stamper and co-conspirators Capizzi and Krug.

154.    Defendants City of St. Louis, through Joyce, Slay, Battle-Turner, Irwin, Switzer,

and Gray, adopted, implemented, enforced, tolerated, and/or ratified the unconstitutional

policies, practices, and customs of Defendants Spence, Ryan, Boettigheimer, Rudolph, Stamper,

Joyce, and Ryan and non-party co-conspirators Capizzi and Krug, all of which operated to

deprive Plaintiff of his constitutional rights.

155.    Defendants City of St. Louis, through Joyce, Slay, Battle-Turner, Irwin, Switzer,

and Gray, are accountable under 42 U.S.C. § 1983 because they intended to and did encourage

and/or reward their agents and employees for violating Plaintiff's constitutional rights and those

of other similarly situated persons.

156.    The unconstitutional policies, practices, or customs include, but are not limited

to:

     a.    conducting investigations not designed to ascertain the truth;

     b.    intentionally failing to investigate potential leads that would uncover

        exculpatory evidence as to an accused and/or develop inculpatory

        evidence against those other than the accused;

     c.    suppressing, destroying or otherwise concealing exculpatory evidence;

     d.    fabricating evidence, including the preparation of false police reports and

        the cell phone records the prosecution introduced at Plaintiff's trial;

     e.    using identification techniques which had a great likelihood of producing

        false and unreliable identifications.

     f.    presenting false evidence and arguments to grand and petit juries, the trial

33

court, and appellate courts;

g.      conducting, encouraging, and concealing prosecutorial misconduct by members of the Circuit Attorney's Office, a practice widely utilized and extending beyond the parameters of this case;

h.      disseminating false information through the media by Joyce and her staff members as well as through Ryan, a paid public relations professional;

i.      improperly training its agents and employees in the techniques and procedures of reliably investigating and preserving evidence in accordance with the constitutional rights of the accused;

j.      improperly supervising its agents and employees in the techniques and procedures of reliably investigating and preserving evidence in accordance with the constitutional rights of the accused;

k.      failing to discipline officers and agents who violate the constitutional rights of suspects, and, in effect, rewarding them for their wrongful acts and omissions;

l.      acting with deliberate indifference to its law enforcement officers' violations of the constitutional rights of accused persons;

157.    There is a policy, practice, and custom of the City of St. Louis, the Circuit Attorney's Office, which Defendant Joyce has implemented, approved of, and/or condoned, of deliberately depriving accused persons of their constitutional rights as exemplified by the following:

a.      Using vindictive prosecutorial tactics to discourage accused persons of exercising their right to trial by threatening more serious charges. *See, e.g.,*

34

*State v. Brandon Robinson*, No. 1422-CR04227-01 (Mo.Cir.Ct. St. Louis City). The trial court's order dismissing that case is attached as **Exhibit 4** and incorporated herein by this reference.

b.    Undermining the rights of the accused to a fair and impartial jury by using the media to taint juries and heighten public condemnation of defendants in criminal cases in violation of Missouri Supreme Court Rule 4-3.8(f) which provides that "except for statements that are necessary to inform the public of the nature and extent of the prosecutor's action and that serve a legitimate law enforcement purpose, [prosecutors should] refrain from making extrajudicial comments that have a substantial likelihood of heightening public condemnation of the accused." In *State v. Polk*, 415 S.W.3d 692 (Mo.App. E.D.2013), during and after Polk's criminal trial, Defendant Joyce "tweeted" the following on her public twitter account: (1) "DNA hit linked him [Polk] to 1992 rape of 11 yr old girl;" (2) "I hope the victim gets justice"; (3) "Finally, justice. David Polk guilty of the 1992 rape of 11 year old girl"; (4) "Aside from DNA, David Polk's victim could identify him 20 years later. Couldn't forget the face of the man who terrorized her." *Id*. at 695. The court of appeals expressed "doubt that using social media to highlight the evidence against the accused and publicly dramatize the plight of the victim serves any legitimate law enforcement purpose or is necessary to inform the public of the nature and extent of the prosecutor's actions" and "concern[] that broadcasting that the accused is a 'child rapist' is likely to arouse heightened public

condemnation." *Id*. at 696. Defendant Joyce was undeterred by *Polk's* condemnation of her use of the media. As alleged in Count VIII *infra*, Defendant Joyce made false and defamatory statements to the media about Cornell McKay to convince the public of his guilt.

c.    Issuing arrest warrants through the Circuit Attorney's warrant office when the charges were not provable beyond a reasonable doubt.

d.    Ordering reviewing prosecutors to apply for arrest warrants in cases where the reviewing prosecutor determined the warrant was unmerited and directly overriding the reviewing prosecutor's determination by the supervisor of the warrant office.

e.    In cases in which prosecutors knew guilt could not be proven beyond a reasonable doubt, supervising prosecutors, with Defendant Joyce's knowledge and permission, instructed subordinate prosecutors not to dismiss the case, to proceed to trial, and to announce ready for trial and to file a nolle prosequi if the defendant was prepared to proceed to trial. The objective of this practice was to keep defendants incarcerated prior to trial and to coerce defendants to accept plea bargains. Pretrial confinement under these circumstances became known within the Circuit Attorney's Office as "doing Jennifer Joyce time."

f.    Retaliating against Assistant Circuit Attorneys who complained about the unconstitutional practices, policies, and policies employed against criminal defendants.

158.   Said policies, customs, or practices were known of and approved of, condoned by,

36

and/or ratified by Defendant Joyce and constituted the official policy of the City of St. Louis.

159.    The policies, practices, and customs described in this Count were carried out during the criminal investigation, prosecution, and appellate process with deliberate indifference to Plaintiff's constitutional rights.

160.    Defendants Slay, Battle-Turner, Irwin, Switzer, and Gray were aware of and approved and/or ratified the conduct of Boettigheimer, Stamper, and Rudolph alleged herein, including the decision not to present Keith Esters to Jane Doe or John Doe in a live lineup, the suggestive identification procedures, and the failure to document the process used to identify Plaintiff as a suspect through the Crime/Matrix, by failing to discipline and/or reprimand said officers, the fabrication of evidence, and the concealment of exculpatory evidence.

161.    Defendant Joyce was aware of and approved and/or ratified the conduct of Boettigheimer, Stamper, Rudolph, Krug, and Capizzi alleged herein, including the decision not to present Keith Esters to Jane Doe or John Doe in a live lineup, presentation of fabricated evidence at Plaintiff's criminal trial, the concealment of exculpatory evidence from Plaintiff's defense counsel, by failing to discipline and/or reprimand Krug and/or Capizzi, and by publicly expressing confidence in procedures employed to prosecute Plaintiff and secure his wrongful conviction, and by asserting that Plaintiff was guilty after dismissing the charges against him.

162.    Defendants are accountable under 42 U.S.C. § 1983 because they were deliberately indifferent to an obvious need to train and supervise investigating officers to avoid constitutional violations arising from the utilization of improper investigative and identification techniques, the failure to document and disclose witness statements, the failure to preserve evidence, the suppression of exculpatory evidence, and the fabrication of evidence.

163.    The City of St. Louis and the St. Louis Board of Police Commissioners requested

the Circuit Attorney's Office to provide training sessions to the St. Louis Metropolitan Police Department on proper investigative and evidence preservation techniques.

164.    The Circuit Attorney's Office was responsible for training Assistant Circuit Attorneys and its agents and employees to recognize and protect the constitutional rights of the accused.

165.    The Defendants in this Count had actual or constructive notice that there were omissions and flaws in their training programs, causing employees to violate the constitutional rights of Plaintiff and defendants in other criminal prosecutions, due to the pattern of constitutional violations arising from the utilization of improper interview and evidence gathering techniques as set forth above. The Defendants named in this Count disregarded the obvious need for properly and thoroughly training their employees in these matters and continued to retain and adhere to the constitutionally-deficient training programs. This continued pattern was carried out with deliberate indifference to the rights of Plaintiff and others criminally prosecuted in the City of St. Louis.

166.    Any training given was pretextual and designed to provide cover for the de facto customs and practices of deliberately depriving large numbers of accused persons of their constitutional rights.

167.    The actions and omissions of each Defendant named in this Count were the direct, legal, and proximate cause of Plaintiff's injuries, harms, and losses as described herein.

168.    If Plaintiff prevails, he is entitled to an award of attorney fees and costs pursuant to 42 U.S.C. § 1988.

## COUNT VI

### Missouri Common Law  False Arrest

38

**(Against Defendants Boettigheimer, Rudolph, and Stamper)**

169.     Plaintiff hereby incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

170.     Defendants Boettigheimer, Rudolph, and Stamper, acting individually or in concert with each other, did willfully and unlawfully under the color of legal authority illegally arrest and/or cause the illegal arrest of Plaintiff and detained him against his will without due and legal process, and without probable cause.

171.     The Defendants' conduct was the direct, legal, and proximate cause of Plaintiff's injuries, harms, and losses as described herein.

## COUNT VII

**Missouri Common Law Malicious Prosecution**

**(Against Defendants Boettigheimer, Rudolph, and Stamper)**

172.     Plaintiff hereby incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

173.     Defendants Boettigheimer, Rudolph, and Stamper, individually or acting in concert with the other Defendants and non-party co-conspirators, did willfully, maliciously, and unlawfully cause Plaintiff to be falsely prosecuted in Court.

174.     Said Defendants advised, encouraged, and caused the institution of the prosecution by applying for charges against Plaintiff, fabricating evidence incriminating Plaintiff, suppressing evidence of Plaintiff's innocence, and presenting false testimony to the grand jury, the court, and the petit jury.

175.     Said Defendants acted without probable cause or reasonable grounds, with an illegitimate motive for the prosecution, and with flagrant disregard for Plaintiff's rights.

176.    Said Defendants accused Plaintiff of criminal activity and exerted influence to initiate and continue and perpetuate judicial proceedings against Plaintiff.

177.    Said Defendants caused Plaintiff to be subjected improperly to judicial proceedings for which there was no probable cause.

178.    Said Defendants acted with malice and without probable cause when they fabricated evidence, suppressed evidence of Plaintiff's innocence, presented false testimony to the grand jury, the court, and the petit jury in order to obtain his wrongful indictment and conviction of serious charges, despite their knowledge that he was innocent.

179.    These unlawful, cruel, cold-blooded, and malicious acts resulted in wrongful prosecution, abuse of process, wrongful conviction, and wrongful imprisonment of Plaintiff.

180.    Plaintiff finally received a favorable outcome stemming from these wrongful charges, indictments, and convictions when, after the Missouri Court of Appeals vacated his convictions and the Supreme Court of Missouri denied transfer of the case, the Circuit Attorney dismissed all charges against Plaintiff.

181.    Said Defendants' conduct was the direct, legal, and proximate cause of Plaintiff's injuries, harms, and losses as described herein.

182.    The malicious, cruel, and cold-blooded conduct of the Defendants in causing the conviction and incarceration of a man they knew to be innocent justifies an award of punitive damages. The actions of said Defendants, as described above, were done knowingly, intentionally, in conscious disregard for and in reckless indifference to Plaintiff's interests and welfare, justifying an award of punitive damages in order to punish the conduct, stop the conduct, deter others from engaging in like conduct, and prevent Defendants from engaging in such conduct in the future.

40

## COUNT VIII

**Missouri Common Law Defamation, Slander, and Libel**

**(Against Defendants Joyce, Ryan, and SC Ryan Consulting, LLC)**

183.    Plaintiff hereby incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

184.    On May 6, 2015, all criminal charges against Plaintiff were dismissed.

185.    Thereafter Defendant Joyce made statements to the public which were gratuitous, false, and defamatory against Plaintiff.

186.    On May 6, 2015, the St. Louis Circuit Attorney's Office issued a press release to print and broadcast media which announced that Defendant Joyce "had dismissed first-degree robbery and armed criminal action charges against" Plaintiff, but asserted that Plaintiff was nevertheless guilty of these crimes. A copy of the press release is attached hereto as **Exhibit 5** and is incorporated herein as if fully set forth.

187.    On information and belief, Defendants Joyce and Ryan drafted the press release.

188.    Defendant Joyce authorized the distribution of the press release to media outlets and its publication on the St. Louis Circuit Attorney's website.

189.    The press release asserted:

        a.    "Given the intense scrutiny and public personal attacks against her and her integrity, the victim no longer wishes to testify at a second trial";

        b.    "Each time a victim testifies, it forces him or her to relive the trauma";

41

     c.     The Circuit Attorney's Office "would never tolerate a prosecutor . . . knowingly pursuing charges against an innocent person";

     d.     The Circuit Attorney's Office "has a solid track record of dismissing cases when information or evidence develops that cause us to question the case. In this case, however, we are unwilling to further traumatize the victim";

     e.     "It is our understanding that [McKay] has expressed his intent to live by the law and pursue his education. We sincerely hope he takes this opportunity to do so."

190.    The press release made clear that Defendant Joyce had no evidence or information causing her to have any doubt in Plaintiff's guilt and that the only reason the case was dismissed was due to Jane Doe's unwillingness to testify at the retrial. In other words, Plaintiff robbed Jane Doe and was guilty of the charges that had been dismissed.

191.    Defendant Joyce repeated and expanded upon the defamatory statements contained in the press release in interviews she gave to the media. Defendant Joyce stated:

     a.     "[T]he one and only reason" the case was dropped was the victim's unwillingness to testify. (St. Louis Post-Dispatch, May 7, 2015).

     b.     Defense claims that Keith Esters was the actual perpetrator of the robbery "were smoke and mirrors" and prosecutors in her office had looked at Esters when the defense first raised him as an alternative perpetrator before the trial. (St. Louis Post-Dispatch, May 7, 2015).

     c.     Defense claims that Esters was the actual perpetrator were "a lot of noise" and that her office looked "extensively" at Esters as a possible suspect,

including statements he made to homicide detectives, but concluded that McKay had committed the robbery. (Riverfront Times, May 7, 2015).

d.    "The easiest thing in the world for me to do would be to charge [Esters], if I thought [Esters] did it. But my job is to pursue justice, and a big part of that is charging the appropriate person with the crime." (Riverfront Times, May 7, 2015).

e.    "The right person was charged with the crime. The problem that we have is that the victim in this case has advised us that she does not want to go through this process again." (KTVI, May 6, 2015).

f.    "We believe Cornell McKay committed this robbery, we have no doubt about that. The only reason we're not going to trial is because the victim does not want to go forward." (Riverfront Times, May 13, 2015).

g.    "I definitely would like to have another trial, because I believe that this is the correct defendant for this crime." (Riverfront Times, May 7, 2015).

192.    Through the above-referenced statements, Defendant Joyce told the public that Plaintiff was responsible for robbing Jane Doe at gunpoint, that the evidence supported the initial charges against Plaintiff as well as his continued prosecution in the retrial, and that information attorneys in her office had reviewed indicated that Esters had not committed the robbery as Plaintiff maintained and that Plaintiff was the actual perpetrator.

193.    On information and belief, Defendants Ryan assisted Defendant Joyce in preparing the statements Joyce made to the media outlets and ratified these statements.

194.    On or about March 20, 2014, after Plaintiff had been sentenced to twelve years' incarceration, Defendant Ryan publicly responded to Plaintiff's contention that someone else

committed the Jane Doe robbery. In an interview with the media (KSDK Channel 5), Defendant Ryan stated: "These matters were investigated, they were researched, and we really believe that all of those things that have been brought up have been litigated, and the right person, Cornell McKay was held accountable. At any point if there were any doubts from this office, we would have addressed that."

195.    Defendant Ryan's statement indicated that defense claims that another person, e.g., Esters, committed the crime had been investigated and determined to be without merit.

196.    Defendant Joyce authorized Defendant Ryan to make the above-referenced statement on behalf of the Circuit Attorney's Office and/or ratified the statement after it was made.

197.    On April 4, 2014, Defendant Joyce and Assistant Circuit Attorney Steven Capizzi appeared for an interview on the Charlie Brennan Show. A transcript of the interview is attached hereto as **Exhibit 6** and incorporated herein by this reference. During the interview, Defendant Joyce and Capizzi made the following false statements:

      a.    When asked about the contention of Plaintiff's "new legal team" that Jane Doe's phone was used to make a call to Kaylin Perry's cell phone 25 minutes after the robbery, Defendant Joyce falsely stated that this evidence was heard by the jury: "It was a contention of the old legal team, too. The jury—everything we've talked about right now was brought up at trial, and the jury heard it." Ex. 6 (Tr. 13). Defendant Joyce later reiterated: "That was the defense at trial, that another guy did it. And they [the jurors] heard all about the phone, and they heard that it was—you know about the calls, and they heard all of that. The jury heard every bit of

that." Ex. 6 (Tr. 25-26). Due to the prosecution's deliberate strategy and knowing improper objections to the official Sprint call records, the jury did not hear the evidence that Jane Doe's phone was used to call Kaylin Perry 25 minutes after the robbery or that the Excel spreadsheets of calls that Jane Doe prepared and that the prosecution relied on omitted numerous calls contained of the official Sprint records.

b.     Capizzi stated that Jane Doe's phone records "indicated that a call was made" to Kaylin Perry but that the phone records for Kaylin Perry's phone "indicated that no phone call was made." Capizzi falsely represented that he was "just telling you what the facts were, and the facts that the jury heard." Ex. 6 (Tr. 15). In fact, prosecutors knew that the jury never heard about the early call to Kaylin Perry. Defendant Joyce heard and did not correct Capizzi's misrepresentation.

c.     When asked whether Keith Esters had told Detective Jackson that Cornell McKay did not commit the Jane Doe robbery, Capizzi stated: "He [Esters] didn't actually say that. He said he was in the area, he knew who did it, and that they were looking at the wrong guy. That was his quote to Detective Jackson." Ex. 6 (Tr. 19). Capizzi denied that Esters' statement could be interpreted to mean that Cornell McKay was the "wrong guy." Ex. 6 (Tr. 19). Defendant Joyce heard and did not correct this misrepresentation.

d.     When asked whether the jury knew that "Keith Esters was out there, and he was a known cell phone stealer," Defendant Joyce responded: "They

45

did know. The defense strategy was that there was another person who committed this robbery. And there—the—Keith Esters girlfriend testified. I mean, they did know that. They heard that. They heard everything about that. That's what the jury heard, and they took that into consideration, but they were still so swayed by the eyewitness testimony and the certainty of those witnesses." Ex. 6 (Tr. 30). Defendant Joyce's statements were untrue as Plaintiff was prohibited from introducing evidence that Esters had committed similar cell phone robberies. This evidence, like the official Sprint records, was not considered by the jury in determining Plaintiff's guilt or innocence.

     e.     Defendant Joyce stated it was "possible they [McKay and Esters] were working together" and represented that "there are some connections between the two." Ex. 6 (Tr. 16). Defendant Joyce knew this statement was false or made the statement with reckless disregard for its truth because there is no evidence of any connection between McKay and Esters.

     198.    The above statements, and the context in which they were made, necessarily imply the existence of other undisclosed objective facts known to Defendants Joyce and Ryan which support the false statement that there was no doubt Plaintiff committed the Jane Doe robbery.

     199.    Contrary to the representations of Defendants Joyce and Ryan, an investigation did not clear Esters of the Jane Doe robbery. In fact, the 9th District conducted no investigation of Esters for the Jane Doe robbery. Evidence gathered by Homicide Detectives investigating the

Jane Doe and Boken crimes directly connected Esters to the Jane Doe robbery and established that Plaintiff was actually innocent.

200.    Further, Homicide Detective Jackson told 9th District detectives that they had the wrong suspect and that they should focus their investigation on Keith Esters. Defendants Joyce and Ryan were made aware of these facts but maliciously persisted in making false and defamatory public statements about Plaintiff.

201.    The statements made by Defendants Joyce and Ryan implicating Plaintiff in the Jane Doe robbery were false and defamatory. Plaintiff did not commit the crime.

202.    The statements were made by Defendants Joyce and Ryan with actual malice, knowing the statements were false or with reckless disregard for the truth or falsity of the statements at a time when they had serious doubts as to the veracity of such statements, and were designed to cover up the fact that 9th District detectives and the St. Louis Circuit Attorney's Office had knowingly sought and obtained the conviction of an innocent man.

203.    Defendants Joyce and Ryan made the defamatory statements knowing that media outlets would disseminate them and they would be read or heard by members of the general public.

204.    Due to the publication of the defamatory statements, Plaintiff's reputation has been seriously and permanently damaged.

205.    As a direct and proximate result of the conduct of Defendants Joyce and Ryan set forth above, Plaintiff suffered injuries, including but not limited to reputational damages, great mental anguish, humiliation, degradation, loss of enjoyment of life, physical and emotional pain and suffering, and other grievous and continuing injuries, harms, losses, and damages.

206.    In particular, the defamatory statements made by Defendants Joyce and Ryan have injured and continue to injure Plaintiff by:

a.    Impugning Plaintiff's personal reputation in the community such that those who interact with him question whether he is a violent criminal;

b.    Limiting Plaintiff's present and future social, business, and employment opportunities, career prospects, and earning potential;

c.    Subjecting Plaintiff to harassment, humiliation, embarrassment, hurt, mental anguish, and pain and suffering for crimes he did not commit.

207.    The actions of Defendants Joyce and Ryan, as described above were done knowingly, intentionally, in conscious disregard for and in reckless indifference to Plaintiff's interests and welfare, justifying an aware of punitive damages in order to punish the conduct, stop the conduct, deter others from engaging in like conduct, and prevent Defendants from engaging in such conduct in the future.

## **Prayer for Relief**

**WHEREFORE**, Plaintiff Cornell McKay respectfully request:

a.    Assume jurisdiction of this cause to determine this controversy and case for hearing on the merits;

b.    Award compensatory and actual damages to Plaintiff and against Defendants, jointly and severally;

c.    Award punitive damages to Plaintiff and against Defendants, jointly and severally;

d.    Award to Plaintiff his costs and attorney's fees, pre-judgment interest, and all other damages allowed by law;

e.      Any other relief this Court deems just and proper.

## JURY DEMAND

Plaintiff demands trial by jury as to all issues so triable under Federal Rule of Civil

Procedure 38(b).

Respectfully submitted,

/s/ Joseph F. Yeckel
Joseph F. Yeckel #45992MO
Law Office of Joseph F. Yeckel, LLC
7710 Carondelet Ave., Suite 208
St. Louis, MO 63105
Phone: (314) 727-2430
Fax: (866) 873-5905
joe@yeckel-law.com

James R. Dowd #28818MO
James R. Dowd, Attorney & Counselor at Law, LLC
34 N. Brentwood Blvd., Suite 209
St. Louis, MO 63105
Phone: (314) 727-6777
Fax: (314) 727-6773
jim@dowdj.com

Robert B. Ramsey #28312MO
Law Office of Robert Brooks Ramsey, LLC
1010 Market St., 13th Floor
St. Louis, MO 63101
Phone: (314) 368-7634
rbramsey7@gmail.com

Thomas J. SanFilippo #63212MO
Thomas SanFilippo & Associates, LLC
1010 Market St., Thirteenth Floor
St. Louis, MO 63101
Phone: (314) 669-5752
Fax: (314) 621-8843
thomas@tsalawoffice.com

ATTORNEYS FOR PLAINTIFF

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 26th day of January, 2016, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent notification of such filing to all counsel of record in this matter.

/s/ Joseph F. Yeckel_____