CORNELL MCKAY,                                )
                                             )
         Plaintiff,                          )
                                             )
vs.                                          )          Case No. 4:15-cv-01315-JAR
                                             )
CITY OF ST. LOUIS, MISSOURI, et al.,         )
                                             )
         Defendants.                         )

## MEMORANDUM AND ORDER

This matter is before the Court on Defendant City of St. Louis's ("the City") Motion to Dismiss (Doc. 83); Defendant Jennifer Joyce's Motion to Strike (Doc. 85); Defendants Joyce, Susan Ryan, and SC Ryan Consulting, LLC's Motion to Dismiss (Doc. 87); Defendant Joseph Spence's Motion to Dismiss (Doc. 89); and Defendants Bettye Battle-Turner, Richard Gray, Thomas Irwin, Francis Slay, and Erwin Switzer's ("St. Louis Board of Police Commissioners") Motion to Dismiss (Doc. 91). The issues are fully briefed and ready for disposition. For the following reasons, the Court will grant the motion to strike filed by Joyce (Doc. 85); grant, in part, the motion to dismiss filed by Joyce, Ryan, and SC Ryan Consulting, LLC (Doc. 87); and deny all other pending motions (Docs. 83, 89, 91).

### I. Background

The facts in the light most favorable to McKay are as follows.[1] On August 10, 2012 at approximately 8:45 p.m., a woman ("Doe") was robbed of her cell phone and $50 as she exited

---

[1] The Court has elucidated these facts from McKay's complaint and exhibits he attached thereto, as well as an opinion of the Missouri Court of Appeals which is necessarily embraced by his pleadings. Smithrud v. City of St. Paul, 746 F.3d 391, 395 (8th Cir. 2014) (when considering a motion to dismiss for failure to state a claim, the Court may consider, inter alia, materials that are part of the public record as well as materials that are necessarily embraced by the pleadings).

her vehicle in front of her home in the Central West End neighborhood of the City of St. Louis. Shortly thereafter, her husband returned home from walking their dog and called 911. Detectives from the St. Louis Metropolitan Police Department's ("SLMPD") 9th District responded, and instructed Doe to continue service to her stolen cell phone, in case her assailant attempted to use it (Second Amended Complaint ("SAC"), Doc. 78 ¶¶ 25-29). Doe's husband informed the detectives that he had encountered a young man while walking their dog, that he had seen the young man about a block from their home, and that the young man had run away after he saw Doe's husband. State v. McKay, 459 S.W.3d 450, 452-53 (Mo. Ct. App. 2014).

On August 13, 2012, Doe provided detectives a spreadsheet of calls that had been made to and from her cell phone between August 10 and August 13; she provided a second spreadsheet on August 18 ("Doe spreadsheets"). According to Doe, she had produced the spreadsheets by downloading a complete list of calls made to and from her phone after the robbery, using her online Sprint account. The Doe spreadsheets indicated that no calls had been made to or from Doe's cell phone until more than 25 hours after the robbery. According to McKay, from August 13 until August 18, 2012, the detectives took little or no action to investigate the Doe robbery; they did not independently request the call records from Sprint, nor did they investigate the phone numbers listed in the Doe spreadsheets, even though they knew the numbers were crucial investigative leads (SAC ¶¶ 31-38).

On August 12, 2012, Keith Esters robbed a woman of her cell phone in a St. Louis suburb (Id. ¶ 100(l)). On August 18, 2012, Esters shot and killed Megan Boken after she resisted his attempt to rob her, at gun point, of her cell phone ("Boken murder"). The Boken murder occurred in the Central West End neighborhood, only a few blocks from the scene of the Doe robbery, and it immediately gained national and local media attention (Id. ¶¶ 47-50). In the

course of their investigation of the Boken murder, detectives from the SLMPD's Homicide Unit learned of the Doe robbery, and they requested information from the 9th District (Id. ¶ 54-57). As alleged by McKay, no one at the 9th District had yet conducted any meaningful investigation of the Doe robbery. The complaint alleges that Defendants Stamper, Boettigheimer, and Rudolph ("9th District detectives") had reason to believe, even before they were contacted by the Homicide Unit, that the Doe robbery and the Boken murder had been committed by the same perpetrator, given their similar methods of operation, geographical proximity, and similarity of witness descriptions of both the perpetrator and weapon used in the crimes (Id. ¶¶ 58-60). Defendant Stamper then assigned Boettigheimer to investigate the Doe robbery. Boettigheimer entered the phone numbers from Doe's spreadsheets into a "Crime/Matrix database," which produced addresses of potential suspects. Based on this search, Boettigheimer initially focused on Lamont Carter, and when Carter's address was entered into the database, a list of between 15 and 20 persons who shared some association with Carter was produced. Although Boettigheimer did not document or preserve any record of this search, he claimed that McKay's name was on this list, and that McKay was the only person on the list who matched the physical description Doe had given of her assailant. Boettigheimer then put out a wanted alert for McKay (Id. ¶¶ 61-71).

On August 21, 2012, McKay turned himself in at the 9th District station. The 9th District detectives questioned him about both the Doe robbery and the Boken murder, but became frustrated when Reverend Chris Douglas provided McKay an alibi and produced three other alibi witnesses. According to McKay, detectives refused to interview the witnesses, and instead arranged for Doe and her husband to view a photographic lineup containing a photo of McKay. Doe identified McKay from the photographic lineup, but her husband did not. The next morning,

Boettigheimer arranged a live lineup, which included McKay but not Esters; Doe identified McKay as the man who had robbed her, and her husband identified McKay as the young man he had seen while walking their dog (Id. ¶¶ 72-79).

Also on August 22, 2012, detectives in the Homicide Unit called each of the phone numbers on the Doe spreadsheets, and learned that one of the numbers belonged to Esters's girlfriend, Kaylin Perry. After Perry was arrested by Homicide detectives, she implicated Esters in both the Doe robbery and the Boken murder. Specifically, Perry revealed that Esters had given her Doe's cell phone, that he had admitted to her that he had committed both crimes, and that he had told her he had robbed a woman of her cell phone and $50. On August 23, 2012, Esters was arrested and questioned by Homicide detectives. He confessed to the Boken murder, and stated that he had been at the scene of the Doe robbery, that he knew who had committed the robbery, and that McKay was not the perpetrator (Id. ¶¶ 81-83).

Multiple Homicide detectives then contacted the 9th District detectives, warning them that they had apprehended the wrong person for the Doe robbery, and urging them to interview Perry (Id. ¶¶ 85-86). McKay alleges that, despite their knowledge of evidence tending to incriminate Esters in the Doe robbery, the 9th District detectives ignored the Homicide detectives' warnings, did not expand their investigation, did not have Doe view a photographic or in-person lineup that included Esters, and instead sought and obtained criminal charges against McKay for the crime (Id. ¶¶ 88-89). Defendant Spence, McKay's probation officer at the time, initiated probation revocation proceedings, and as alleged by McKay, knowingly filed a false probation-violation report, stating that officers had discovered pictures of McKay on Doe's stolen cell phone. This false statement led a judge to set bail higher in McKay's revocation

proceeding than in his criminal case. McKay could not afford to post the higher bail and was thus detained until his criminal trial (Id. ¶¶ 102(j)-(k), 121(c), 130).

In the meantime, the Homicide detectives had subpoenaed Sprint for records detailing calls made to and from Doe's cell phone, and they received those records on September 19 (Id. ¶¶ 42-44). Unlike Doe's self-prepared spreadsheets, the call-detail records from Sprint showed that a call had been made from Doe's cell phone to Perry's phone at 9:10 p.m. on August 10, or approximately 20 to 25 minutes after the Doe robbery (Id. ¶¶ 45-46). The Homicide detectives also found—hidden under Esters's couch—clothing matching Doe's description of the clothing her assailant had been wearing during the robbery; and based on information Perry provided, they recovered Doe's cell phone from a gas station, where employees identified Perry and Esters as the individuals who had sold them the phone (Id.¶ 100; Docs. 78.6 at 4, 15-16, 18, 26; McKay, 459 S.W.3d at 454, 459).

Before his criminal trial, McKay notified the state trial court that he intended to rely on an alternative perpetrator defense, i.e. that Esters had committed the Doe robbery (SAC ¶ 102(g)(iii); McKay, 459 S.W.3d at 454). Prosecutors from the Circuit Attorney's Office sought to exclude evidence supporting McKay's defense and to prevent any mention of Esters or Boken at trial. The state trial court sustained most of the prosecutors' motions, ruling that McKay could not present, inter alia, Esters's incriminating admissions regarding the Doe robbery or the clothing found at his residence, and that no reference could be made to the Boken case or Esters's involvement in the Boken murder (McKay, 459 S.W.3d at 454-58). McKay also alleges that, before his trial, the 9th District detectives damaged or destroyed Doe's cell phone in bad faith and to such a degree that no information—including text messages which would have established a direct connection to an alternative perpetrator—could be retrieved from it by

defense experts (SAC ¶¶ 102(p), 115). He further asserts that, prompted by representatives of the Circuit Attorney's Office and in an effort to get Doe to ratify her previous misidentification of McKay, Boettigheimer approached Doe six months after the Doe robbery; warned her that McKay planned to raise an alternative-perpetrator defense; told her that her robber had transferred her cell phone to someone else after the robbery; falsely informed her that McKay and Esters were "associates"; and presented her a photograph of Esters for identification (Id. ¶ 102(g)). Doe did not identify Esters as her robber. According to McKay, there was no evidence suggesting that McKay and Esters were connected, and Boettigheimer knew that McKay and Esters were not associates (Id.).

At McKay's trial, Doe testified that, during the in-person lineup, she had immediately recognized McKay as the person who robbed her, that she took time to look at each person in the lineup, and that she was sure she recognized McKay as the man who had robbed her (McKay, 459 S.W.3d at 453). Prosecutors from the Circuit Attorney's Office introduced the Doe spreadsheets into evidence, knowing that they did not accurately reflect the phone's usage after it was stolen; and Doe testified that her self-prepared spreadsheets were complete, specifically denying that any calls had been omitted (SAC ¶¶ 39-41). This gave the jury the false impression that Doe's phone had not been used to call Perry until 25 hours after the robbery, during which time McKay could have given the phone to Esters. McKay tried to introduce the Sprint call-detail records as rebuttal to Doe's spreadsheets, but the prosecutors successfully objected to their admissibility in the absence of supporting expert testimony (Id. ¶¶ 94-99). The prosecutors also successfully objected to proffered testimony that Esters owned a small, silver handgun that matched Doe's description of the gun her assailant used (McKay, 459 S.W.3d at at 454; Doc.

78.6 at 12-13). The jury found McKay guilty of first-degree robbery and armed criminal action, and he was sentenced to 12 years in prison (SAC ¶ 103).

After McKay served more than two years of his sentence, the Missouri Court of Appeals vacated his convictions and remanded the case for a new trial, specifically concluding that the trial court's exclusion of the Sprint call-detail records and the additional evidence linking Esters to the Doe robbery had been manifestly unjust (SAC ¶¶ 7, 180; McKay, 459 S.W3d at 456, 458). The Circuit Attorney's Office declined to try McKay a second time, and on May 6, 2015, all criminal charges against him were dismissed (SAC ¶¶ 8, 184, 186). Joyce issued a press release, and held a press conference during which she stated, inter alia, that she did not doubt McKay's guilt, and that the charges against him had been dismissed only because Doe was unwilling to testify at another trial (Id. ¶¶ 186-196). Joyce and a prosecutor from the Circuit Attorney's Office thereafter appeared on a local radio show, and made several statements regarding their continued belief that McKay committed the Doe robbery and their desire to prosecute McKay for the robbery but for the Does' decision not to testify at his retrial (Id. ¶ 197; Doc 78.6). Ryan is the official spokesperson for the St. Louis Circuit Attorney's Office, and her firm, SC Ryan Consulting, provides public relations services to the St. Louis Circuit Attorney's Office (SAC ¶¶ 19-20). According to McKay, the City has procured an insurance policy that provides coverage for the misconduct of its employees and agents that he alleges in his second amended complaint (Id. ¶ 22).

## II. McKay's Claims

In his complaint, as amended, McKay alleges that the 9th District detectives violated his due process rights by suppressing the Sprint call-detail records and neighborhood surveillance videos, by damaging or destroying Doe's cell phone after it was recovered, but before defense

experts could examine it, and by engaging in "highly suggestive behavior" designed to elicit misidentifications of McKay as the perpetrator of the Doe robbery (Id. ¶¶ 113-119). He also claims that the 9th District detectives fabricated evidence against him, in violation of his due process rights, by coaching Doe and her husband to misidentify him as the perpetrator of the Doe robbery, and by fabricating the Doe spreadsheets to inaccurately reflect that no calls were made from the phone until the day after it was stolen (Id. ¶¶ 115, 121(a)-(b)). He also asserts a claim that Spence fabricated evidence against him by preparing and submitting a fabricated report in his probation-revocation proceeding (Id. ¶ 121(c)). In addition, McKay claims that the 9th District detectives recklessly or intentionally failed to investigate the Doe robbery, in violation of his due process rights, by purposefully ignoring evidence that established his innocence and directly connected Esters to the Doe robbery; that Defendant Spence violated his due process rights by filing the false probation violation report; and that the 9th District detectives, Spence, Joyce, and Ryan conspired to unlawfully bring about his wrongful arrest and conviction (Id. ¶¶ 120-125).

McKay further alleges that Joyce and the Board—as policymaking officials for the City—ratified and adopted the misconduct of the 9th District detectives and Spence, thereby making their misconduct the official policy or custom of the City and SLMPD (Id. ¶¶ 117, 122, 131). According to McKay, the City of St. Louis is liable for the misconduct of its agents and employees—here, Joyce, the 9th District detectives, Spence, Ryan, and SC Ryan Consulting— because it had unconstitutional policies or customs of, inter alia, conducting investigations not designed to ascertain the truth, intentionally failing to investigate leads, suppressing exculpatory evidence, fabricating evidence, using unreliable identification techniques, presenting false evidence and arguments to grand and petit juries, encouraging and concealing prosecutorial

misconduct, improperly training its agents and employees, failing to discipline officers who violated suspects' constitutional rights, and acting with deliberate indifference to its law enforcement officers' violations of accused persons' constitutional rights (Id. ¶ 156). McKay also asserts Missouri state-law claims against the 9th District detectives for false arrest and malicious prosecution; and against Joyce, Ryan, and SC Ryan Consulting for defamation, slander, and libel (Id. ¶¶ 169-207).

McKay alleges that the 9th District detectives destroyed or suppressed exculpatory evidence, fabricated evidence against him, recklessly or intentionally failed to investigate the Doe robbery, and conspired with Spence, Joyce, and Ryan to deprive him of his constitutional rights (SAC at ¶¶ 113-146.) The 9th District detectives have not moved to dismiss McKay's claims against them, and the other defendants do not dispute that he has stated viable § 1983 claims against the 9th District detectives based on their allegedly recklessly investigation of the Doe robbery. The remaining defendants now move to dismiss on various grounds.

### III. Motion to Dismiss Legal Standard

Federal Rule of Civil Procedure 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief." The pleading standard of Rule 8 "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007). To survive a motion to dismiss, a complaint must show that the pleader is entitled to relief, in order to give the defendant fair notice of what the claims are and the grounds upon which they rest. Id.

Fed. R. Civ. P. 12(b)(6) provides for a motion to dismiss based on the failure to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "'state a claim to relief that

is plausible on its face.'" <u>Ashcroft v. Iqbal</u>, 129 S. Ct.1937, 1950 (2009). In the complaint, a plaintiff must include sufficient factual information to provide the grounds on which his claims rest, and to raise a right to relief above a speculative level. <u>Schaaf v. Residential Funding Corp.</u>, 517 F.3d 544, 549 (8th Cir. 2008) (citing <u>Twombly</u>, 550 U.S. at 555 & n.3). This obligation requires a plaintiff to plead "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." <u>Twombly</u>, 550 U.S. at 555. A complaint must contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory. <u>Id.</u> at 562. This standard "simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of [the claim or element]." <u>Id.</u> at 556.

When ruling on a motion to dismiss, this Court must take the allegations of the complaint as true and liberally construe the complaint in a light most favorable to the plaintiff. <u>Kottschade v. City of Rochester</u>, 319 F.3d 1038, 1040 (8th Cir. 2003). The Court is "free to ignore legal conclusions, unsupported conclusions, unwarranted inferences and sweeping legal conclusions cast in the form of factual allegations." <u>Wiles v. Capitol Indem. Corp.</u>, 280 F.3d 868, 870 (8th Cir. 2002). Also, at the motion to dismiss stage, a court generally may not consider matters outside the pleadings. <u>Porous Media Corp. v. Pall Corp.</u>, 186 F.3d 1077, 1079 (8th Cir. 1999). It may, however, consider matters of public record, materials that do not contradict the complaint, exhibits attached to the pleadings, and materials necessarily embraced by the complaint. <u>Mills v. City of Grand Forks</u>, 614 F.3d 495, 498 (8th Cir. 2010).

## IV. Analysis

### A. The Board's Motion to Dismiss

In support of its motion to dismiss, the St. Louis Board of Police Commissioners (hereinafter "the Board") argues that McKay has failed to state a claim against the City because he has not identified any unconstitutional policy or custom pursuant to which the 9th District detectives allegedly violated his rights, because he has not identified any deficiencies in the training the Board provided the 9th District detectives, and because he has not plausibly alleged that the Board was deliberately indifferent to a pattern of unconstitutional misconduct by SLMPD officers (Docs. 92, 103). In response, McKay contends that he has stated viable § 1983 claims. First, he asserts his amended complaint states a claim because it alleges that the Board adopted a policy that caused his rights to be violated. Second, he argues that he has stated a claim based on his allegation that the Board failed to adequately train its police officers, including the 9th District detectives, to avoid violating the constitutional rights of suspects in criminal investigations by utilizing improper investigations and eyewitness identification techniques, failing to document and disclose witnesses' statements, failing to preserve evidence, suppressing exculpatory evidence, or fabricating evidence. Third, McKay argues that he has stated a viable § 1983 claim because he alleges that the Board had notice of and ratified an unconstitutional custom, i.e., the 9th District detectives' pattern of continuing and persistent misconduct of unconstitutional actions during the investigation of the Doe robbery (Doc. 98).

"Intentionally or recklessly failing to investigate other leads or manufacturing false evidence may shock the conscience and can violate the Fourteenth Amendment's due process clause." Livers v. Schenck, 700 F.3d 340, 350 (8th Cir. 2012). To shock the conscience, the challenged state action must be "truly egregious and extraordinary" and "so severe as to amount

to brutal and inhumane abuse of official power." Id. (internal quotations omitted). The Eighth Circuit has recognized three areas of reckless investigation: (1) coercing a suspect's confession; (2) purposely ignoring evidence suggesting a suspect's innocence; and (3) systemic pressure to implicate a suspect in the face of evidence to the contrary. Id. An allegation that a defendant has "purposefully ignored evidence that strongly tended to exonerate" the plaintiff can be sufficient to support a § 1983 failure-to-investigate claim. Moran v. Clarke, 296 F.3d 638, 648 (8th Cir. 2002).

A municipality or local government may be sued directly under § 1983 when that local government implements an unconstitutional policy or custom. Monell v. Dep't Soc. Servs., 436 U.S. 658, 690-91 (1978). However, a municipality may not be sued under § 1983 for injuries inflicted solely by its employees or agents. Id. Rather, a plaintiff must plead that his injury was caused by "the execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." Id. Such a showing ultimately requires proof of either the existence of an official municipal policy or misconduct so pervasive among non-policymaking employees of the municipality as to constitute a custom or deliberate indifference to individuals' federal rights. Ware v. Jackson Cty., Mo., 150 F.3d 873, 880 (8th Cir. 1998). Although rare, a public official's single incident of unconstitutional activity can also establish the requisite municipal policy or custom, so long as the decision is made by the highest officials responsible for setting policy in that area of the government's business. City of St. Louis v. Praprotnik, 485 U.S. 112 (1988) (plurality); Rynders v. Williams, 650 F.3d 1188, 1195 (8th Cir. 2011). It is not necessary that the decision-maker intended that the decision apply to a wide range of situations; rather, even a single decision tailored to a particular situation may

qualify as an official government policy for purposes of establishing municipal liability under § 1983. Pembaur v. City of Cincinnati, 475 U.S. 469, 481 (1986) (plurality).

"Policy" and "custom" are not interchangeable concepts. An official policy involves "a deliberate choice to follow a course of action made from among various alternatives by an official who is determined by state law to have the final authority to establish governmental policy." Ware, 150 F.3d at 880. A policy may take the form of a policy statement, local ordinance, regulation, or decision officially adopted and promulgated by a local government's officers. Monell, 436 U.S. at 690. In contrast, a custom is demonstrated by (1) the existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the municipality's employees; (2) deliberate indifference to or tacit authorization of such conduct by the municipality's policymaking officials after notice of the misconduct; and (3) the § 1983 plaintiff's injury by state action taken pursuant the municipality's custom, i.e. proof that the custom was the moving force behind the constitutional violation. Ware, 150 F.3d at 880. While a § 1983 plaintiff must include allegations, references, or language by which one could begin to draw the inference that the conduct of which he complains was the result of an unconstitutional policy or custom, he need not specifically plead the unconstitutional policy or incorporate the policy's specific language into his complaint. Crumpley-Patterson v. Trinity Lutheran Hosp., 388 F.3d 588, 591 (8th Cir. 2004). At the time his complaint is filed, a plaintiff may not be privy to the facts necessary to accurately describe or identify the specific policies or customs which may have caused the deprivation of his constitutional right. Doe ex rel. Doe v. School Dist. of City of Norfolk, 340 F.3d 605, 614 (8th Cir. 2003).

McKay has alleged the existence of multiple policies and customs, including policies related to the suppression, destruction, and fabrication of evidence; the use of coercive or unduly

suggestive lineups; inadequate training of police officers; and refusal to discipline officers who commit constitutional violations. He also alleges that multiple officers and prosecutors were involved in unconstitutional acts such as fabricating and suppressing evidence, and unduly influencing the Does' eyewitness identifications. The allegations suggest that the 9th District detectives acted pursuant to a municipal policy or custom, given the plausible inference that such coordinated and widespread conduct could not exist without express or tacit approval by City policymakers. Ware, 150 F.3d at 880. As alleged by McKay, the 9th District detectives' misconduct while investigating the Doe robbery was not an isolated incident involving separate and independent acts by unrelated employees of the SLMPD; rather, he alleges that their conduct was part of a conspiracy of multiple officers and prosecutors, and that it occurred over the course of several months. Accordingly, the Court finds that the complaint allegations support a reasonable inference that the 9th District detectives' conduct was undertaken with the actual or tacit approval of the City. Id.

The Court further concludes that McKay has asserted plausible failure-to-train claims against the Board. A municipality may be subject to § 1983 liability for inadequate training of its employees where (1) its training practices were inadequate; (2) it was deliberately indifferent to the rights of others in adopting them, such that the failure to train reflects a deliberate or conscious choice; and (3) the alleged deficiency in its training procedures actually caused plaintiff's injury. See Parrish v. Ball, 594 F.3d 993, 997-98 (8th Cir. 2010). McKay's complaint, as amended, alleges that the Board failed to adequately train its police officers, including the 9th District detectives, in proper investigative and identification techniques, procedures for preserving evidence, and constitutional limits on suppression of exculpatory evidence, as well as fabrication of evidence; that the Board knew that the omissions in its training program had led to

constitutional violations in other prior criminal proceedings; and that McKay was harmed by the 9th District detectives' constitutionally inadequate training. The Court will thus deny the Board's motion to dismiss.

**B. The City's Motion to Dismiss**

In its motion to dismiss, the City argues (1) that it is not subject to municipal liability for the 9th District detectives' unconstitutional conduct because the Board, and not the City, controlled the SLMPD at the time the alleged misconduct occurred; (2) that the City did not become a successor-in-interest to the Board's liabilities when it assumed control of the SLMPD on September 1, 2013; (3) that McKay has failed to state a claim against City, as he has not alleged that the City had any notice of wrongdoing by the SLMPD or any facts tending to show that the City was deliberately indifferent to, or tacitly authorized, any allegedly wrongful conduct; and (4) that the City is entitled to sovereign immunity from any state tort claims pursuant to Mo. Stat. § 537.600.1 (Doc. 84.) In response, McKay asserts that both the City and the Board are proper municipal defendants in this action. More specifically, he contends that the Board was in control of SLMPD, pursuant to Mo. Rev. Stat. § 84.010, until at least September 1, 2013, when the Missouri General Assembly enacted Mo. Rev. Stat. § 84.344, which directed the City to enact an ordinance authorizing the transfer of control over SLMPD to the City. According to McKay, the City assumed responsibility for the Board's previously incurred liabilities by adopting Ordinance 69489, which became effective on September 1, 2013. He further asserts that the City is a proper municipal defendant to this action because at least some of the alleged misconduct occurred after control of SLMPD was transferred to the City. Finally, McKay argues that the doctrine of sovereign immunity does not apply to his state tort claims, as the City has waived such protection by procuring insurance (Doc. 96).

15

At this stage of the proceeding, the Court cannot determine whether the Board, the City, or both may ultimately be responsible for the 9th District detectives' allegedly unconstitutional conduct. <u>Allen v. City of St. Louis</u>, No. 4:14-cv-1398, 2015 WL 3407652, at *2 (E.D. Mo. May 26, 2015) (denying motion to dismiss claims against the City because it was unclear which entity was proper defendant given recent transfer of control over SLMPD from the Board to the City). Moreover, in light of McKay's assertion that the alleged misconduct took place both before and after control of the SLMPD was transferred to the City, it is possible that the City and the Board may both face liability. <u>Id.</u> Because both the City and the Board may ultimately be proper municipal defendants in this action, the Court will deny the City's motion to dismiss on this ground.

As to the City's argument that it enjoys absolute sovereign immunity from McKay's tort claims under Missouri law, the Court notes that McKay alleges that the City has acquired an insurance policy that provides coverage for the alleged misconduct of its employees. Mo. Rev. Stat. § 537.610; <u>see also</u> <u>Bennartz v. City of Columbia</u>, 300 S.W.3d 251, 259 (Mo. Ct. App. 2009) (public entities in Missouri are not immune from suit to the extent they have procured insurance, thereby waiving sovereign immunity up to but not beyond the policy limit and only for acts covered by the policy). Thus, the Court concludes that the City may have waived its sovereign immunity against McKay's Missouri tort claims by procuring an insurance policy covering such liabilities, and that dismissal of his state-law claims against the 9th District detectives—based on sovereign immunity—would be premature at this state of the proceeding.[2] The Court will thus deny the Board's motion to dismiss.

---

[2] As discussed below, McKay failed to state viable state-law claims against Joyce, Ryan, and SC Ryan Consulting because the statements at issue were not defamatory. As such, the Court need not address whether the City is entitled to sovereign immunity against those claims.

**B. Probation Officer Joseph Spence's Motion to Dismiss**

In his motion to dismiss and supporting memorandum, Spence argues that he is entitled to absolute immunity in his role as a state probation officer performing a function related to the judicial process; that he is entitled to qualified immunity, as his report included only one untrue fact; that McKay has failed to state a claim against him; and that McKay's claims are barred by the Rooker-Feldman doctrine (Docs. 89-90). In response, McKay asserts that Spence is not entitled to absolute immunity because his actions were neither prosecutorial nor judicial in nature; that Spence is not entitled to qualified immunity because he purposefully lied in the probation revocation proceeding; that his complaint states viable claims against Spence; and that the Rooker-Feldman doctrine does not apply to his claims, as he does not seek to overturn a state court judgment (Doc. 97).

McKay's complaint, as amended, alleges that Spence violated his due process rights by knowingly filing a report in his probation revocation proceeding which falsely asserted that law enforcement officers had discovered photographs of McKay on Doe's stolen cell phone, and by conspiring with Joyce and the 9th District detectives to unlawfully obtain his conviction. According to McKay, Spence's false statement in the probation-revocation proceeding caused the judge to set a high bail amount in that case, based on its false impression that there was significant evidence linking him to the Doe robbery, and resulted in McKay being detained until his criminal trial.

The Court concludes that Spence is not entitled to absolute immunity. Probation and parole officers are entitled to absolute immunity when they perform duties that are functionally comparable to those of judges, such as performing presentence investigations, preparing presentence reports, and deciding whether or not to approve inmates for parole. Anton v. Getty,

78 F.3d 393, 395-97 (8th Cir. 1996). They are also protected by absolute immunity when they perform duties that are functionally comparable to those of a prosecutor in deciding whether to initiate a criminal prosecution. Ray v. Pickett, 734 F.2d 370, 374 (8th Cir. 1984). However, when parole and probation officers file reports to judicial officers alleging that parolees have violated their parole—an act more akin to that of a police officer deciding whether there is probable cause for an arrest—they do not exercise the same degree of discretion as a prosecutor in initiating a criminal prosecution, and they are not protected by absolute immunity. Id. As such, the Court concludes that Spence is not entitled to absolute immunity from McKay's claim that he knowingly filed a falsified report alleging that McKay had violated his probation, at least in part based on his alleged involvement in the Doe robbery.

The Court also concludes that, at this stage of the proceeding, Spence is not entitled to dismissal based on qualified immunity. Probation officers may be entitled to qualified immunity from liability based on their preparation and submission of probation and parole violation reports. Id. Qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable official would have known. Pearson v. Callahan, 555 U.S. 223, 231-32 (2009). The Court finds that McKay has stated viable claims that Spence violated his constitutional rights by knowingly filing a report containing false information in his probation revocation proceeding, and by conspiring to unlawfully convict him of charges arising out of the Doe robbery, and that these rights were clearly established at the time of the alleged violations. See Ray, 734 F.2d at 374 (discussing § 1983 claim based on allegations that parole officer falsified parole violation report). The Court further concludes that these claims are not barred by the Rooker-Feldman doctrine. See Exxon Mobil Corp. v. Saudi Basic Indus. Corp., 544 U.S.

280, 283-84 (2005) (Rooker-Feldman doctrine is confined to cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments).

**C. Circuit Attorney Joyce, Ryan, and SC Ryan Consulting, LLC's Motion to Dismiss**

In their motion to dismiss, Joyce, Ryan and SC Ryan Consulting, LLC argue that the claims against them should be dismissed because (1) Joyce is entitled to absolute prosecutorial immunity in both her official and individual capacities; (2) McKay has failed to state any viable § 1983 or state-law claims against Joyce, Ryan, or SC Ryan Consulting; (3) the policies, practices, and customs McKay identifies in his complaint are unrelated to his claim that the Circuit Attorney's Office violated his constitutional rights; and (4) Joyce is entitled to sovereign immunity from McKay's state-law claims (Doc. 88). In response, McKay contends that he has stated a viable § 1983 conspiracy claim against these defendants because their statements to the media were a key component of the alleged conspiracy to cover up his wrongful conviction; that Joyce is not entitled to prosecutorial immunity in her official capacity because she is a policymaker for the City; and that he has alleged sufficient facts to give rise to a viable § 1983 claim based on unconstitutional policies or customs within the Circuit Attorney's Office, as well as state-law slander and libel claims. In reply, Joyce, Ryan, and SC Ryan Consulting, LLC first argue that McKay's § 1983 claim against them should be dismissed because it is premised only on post-conviction statements regarding Joyce's belief that the correct suspect had been arrested and prosecuted for the Doe robbery. They further assert that Joyce is not a policymaker for the City, but that she instead acts on behalf of the State of Missouri; and that McKay cannot state a claim of supervisory liability against Joyce based on mere allegations that she knew of the 9th District detectives' misconduct or misconduct by her subordinates in the Circuit Attorney's

Office. They also contend that McKay has not alleged sufficient facts to support an inference that Joyce knew of the 9th District detectives' misconduct; and that McKay has not identified unconstitutional policies of the Circuit Attorney's Office that caused his constitutional rights to be violated. Finally, they claim that his state-law claims for slander and libel must fail because they are based on protected statements of opinion (Doc. 104).

1. Prosecutorial Immunity

Joyce seeks dismissal of the § 1983 claims against her on the basis that she is entitled to absolute prosecutorial immunity for actions she took in her role as supervisor of the Circuit Attorney's Office. In response, McKay argues that Joyce is not entitled to immunity in her role as a supervisor, or in her official capacity.

Prosecutors enjoy absolute immunity, in their individual capacities, for acts they perform in "initiating a prosecution and in presenting the state's case." Imber v. Pachtman, 424 U.S. 409, 431 (1976). Prosecutors are absolutely shielded from liability in section 1983 actions when they take actions that are "intimately associated with the judicial phase of the criminal process," as opposed to investigative police work or administrative duties. Reasoner v. St. Louis Cty., Mo., 447 F.3d 569, 579-80 (8th Cir. 2006). Absolute prosecutorial immunity cannot be defeated by allegations of malice, vindictiveness, or self-interest; and prosecutors are absolutely immune even if they present false, misleading, or perjured testimony, or withhold or suppress exculpatory evidence. Id. at 580. In addition, supervisory prosecutors enjoy absolute immunity from claims that their supervision or training of subordinate prosecutors was constitutionally inadequate. Van de Kamp v. Goldstein, 555 U.S. 335, 343-49 (2009). Prosecutors also enjoy absolute immunity from civil conspiracy charges where their alleged participation in the conspiracy consists only of otherwise immune acts. Reasoner, 447 F.3d at 580. Here, McKay asserts § 1983 claims against

Joyce in her individual capacity based on her and her subordinate's initiation and prosecution of criminal charges arising out of the Doe robbery. Accordingly, Joyce is entitled to absolute prosecutorial immunity against such claims, and the Court will thus dismiss McKay's § 1983 claims to the extent he brings them against Joyce in her individual capacity.

The defense of absolute prosecutorial immunity does not apply to McKay's § 1983 claims against Joyce in her official capacity, as official-capacity suits are the equivalent of suits against the governmental entity for which an official works, and governmental entities are not protected by prosecutorial immunity. See Davis v. Hall, 375 F.3d 703, 710 n.3 (8th Cir. 2004); Johnson v. Outboard Marine Corp., 172 F.3d 531, 535 (8th Cir. 1999). As such, Joyce's government-employer may be liable for actions she took in violation of McKay's constitutional rights if her unconstitutional conduct was the result of an official municipal custom or policy. Monell, 436 U.S. at 690-91. As discussed above, in order to state a Monell claim against the City based on Joyce's unconstitutional conduct, McKay need only plead that she undertook allegedly unconstitutional conduct pursuant to a policy or custom of the City. Id. He may also state a § 1983 claim against the City by pleading that Joyce was the City's policymaker for the Circuit Attorney's Office, and that she adopted or ratified an unconstitutional custom or policy pursuant to which employees of the Circuit Attorney's Office violated his constitutional rights. The City contends that it cannot be liable for Joyce's unconstitutional conduct because she is neither a City employee nor policymaker, but is instead an elected state official (Doc. 84 at 6). In response, McKay argues that he has stated viable Monell claims against the City, based on injuries he suffered as a result of unconstitutional policies and practices of the Circuit Attorney's Office, as adopted or ratified by Joyce, its official policymaker.

Here, McKay has alleged that Joyce was the policymaker for the City, and that she encouraged agents and employees of the City to violate McKay's constitutional rights. He further alleges that the City, through Joyce and the Board, "adopted, implemented, enforced, tolerated, and/or ratified" unconstitutional policies, practices, and customs, including, inter alia, conducting criminal investigations not designed to ascertain the truth; intentionally failing to investigate leads that would uncover exculpatory evidence as to an accused; intentionally failing to develop inculpatory evidence against other potential suspects; suppressing, destroying, or otherwise concealing exculpatory evidence; fabricating evidence, including the Doe spreadsheets; utilizing identification techniques which presented a great likelihood of producing false or unreliable eye witness identifications; presenting falsified evidence in criminal proceedings; conducting and encouraging prosecutorial misconduct; and improperly training City agents and employees in proper procedures for reliably investigating crimes and preserving evidence in accordance with the constitutional rights of the accused. In light of McKay's assertions that his constitutional rights were violated pursuant to a City policy or custom "adopted, implemented, enforced, tolerated, and/or ratified" by Joyce, the Court concludes that he has stated plausible Monell claims against the City based on Joyce's conduct.

In addition, McKay claims that the City had actual or constructive notice that there were omissions or flaws in training programs it provided employees of the Circuit Attorney's Office, that the City disregarded an obvious need to properly train its prosecutors and continued to use constitutionally-deficient training programs; and that their inadequate training led prosecutors to violate the rights of McKay and other criminal defendants. Thus, the Court finds that McKay has stated a viable § 1983 claim against Joyce in her official capacity, and as such, against the City, based on her alleged failure to train the employees and agents of the Circuit Attorney's Office.

22

See Parrish, 594 F.3d at 997-98 (discussing failure-to-train claims); see also Carter v. City of Philadelphia, 181 F.3d 339, 352-53 (3d Cir. 1999) (local law enforcement officials may be State officials when they prosecute crimes or otherwise carry out policies established by the State, but they serve as local policymakers when they manage or administer their own offices); Walker v. City of New York, 974 F.2d 293, 301 (2d Cir. 1992) (district attorney's alleged mismanagement of office and decision not to supervise or train subordinates was properly attributable to city; when prosecutor acts as manager of prosecutor's office, she acts as county policymaker).

### 2. Section 1983 Conspiracy Claim

Joyce, Ryan, and SC Ryan Consulting contend that McKay failed to plead sufficient facts tying them to any alleged conspiracy to violate his constitutional rights. McKay argues that he has stated a viable § 1983 conspiracy claim because his complaint, as amended, alleges that Defendants decided to pursue criminal charges against him to cover up the 9th District detectives' inadequate investigation of the Doe robbery, even though they had reason to believe that Esters had actually perpetrated the crime.

In his complaint, McKay alleges that the 9th District detectives, Joyce, Ryan, Spence, and prosecutors "had a meeting of the minds and, beginning on or about August 18, 2012, there existed an agreement between two or more of them to commit at least one unlawful act to bring about [his] wrongful arrest, prosecution, conviction, and incarceration." His complaint further alleges that these defendants, with the purpose of framing him for the Doe robbery, conspired to implicate him and prosecute him for the Doe robbery, even though there was a lack of probable cause or a factual basis linking him to the crime and notwithstanding the fact that they had reason to believe Esters was the true perpetrator. He further alleges that one or more of these defendants took overt acts, in furtherance of the conspiracy, including (1) conducting a sham

23

investigation that was not designed to ascertain the truth; (2) continuing to rely on the incomplete Doe spreadsheets after receiving the more accurate Sprint call-detail records; (3) utilizing highly suggestive techniques for witness identifications; (4) preparing false police reports, including a report which falsely asserted that Perry knew nothing about the Doe robbery; (5) presenting false information in McKay's probation-revocation proceeding; and (6) failing to preserve critical evidence, including Doe's recovered cell phone.

To state a § 1983 conspiracy claim, a plaintiff must allege that "(1) the defendant conspired with others to deprive him of a constitutional right; (2) that at least one of the alleged co-conspirators engaged in an overt act in furtherance of the conspiracy; and (3) that the overt act injured the plaintiff." White v. McKinley, 519 F.3d 806, 814 (8th Cir. 2008). A plaintiff need not show that each conspiracy participant knew the exact limits of the illegal plan, but he must allege facts sufficient to support the conclusion that the defendants reached an agreement to deprive him of constitutionally guaranteed rights. Id. at 816. A meeting of the minds or understanding among the conspirators to achieve the conspiracy's aims may be inferred from the facts. Id.

McKay has alleged facts sufficient to support a § 1983 conspiracy claim against the 9th District detectives, Joyce, and Spence. Id. at 814. His second amended complaint asserts sufficient facts to support a reasonable conclusion that the 9th District detectives, Joyce, Spence, and prosecutors reached an agreement to violate his constitutional rights by implicating him in the Doe robbery in an effort to cover up the 9th District detectives' failure to timely investigate the crime. His complaint allegations further support the reasonable conclusion that the 9th District Detectives, Joyce, Spence, and prosecutors were motivated to implicate a suspect other than Esters in the Doe robbery, and that members of the conspiracy undertook unconstitutional

actions to secure criminal charges against McKay, as well as to ultimately secure his conviction, despite their awareness of evidence tending to vindicate him and inculpate Esters.

The Court concludes however, that McKay has failed to state a plausible § 1983 conspiracy claim against Ryan, as nothing in his complaint, as amended, supports an inference that she conspired to deprive McKay of his constitutional rights. Id. In addition, the Court concludes that McKay's § 1983 conspiracy claim against Joyce in her individual capacity must fail because, as discussed above, she is entitled to absolute prosecutorial immunity from suit based on actions she took in her role as Circuit Attorney. Thus, the Court will grant the motion to the extent it seeks dismissal of McKay's § 1983 conspiracy claim against Joyce in her individual capacity based on prosecutorial immunity, and his § 1983 claim against Ryan for failure to state a claim.

### 3. State-Law Defamation Claims

According to McKay, Joyce made the following allegedly defamatory statements to various media outlets after she decided not to retry him for the Doe robbery:

- "[T]he one and only reason" she dismissed the criminal charges against McKay was Doe's unwillingness to testify.

- Defense claims that Esters perpetrated the Doe robbery "were smoke and mirrors" and "a lot of noise," and prosecutors had "extensively" investigated Esters when McKay first raised his alternative-perpetrator defense.

- "The easiest thing in the world for me to do would be to charge [Esters with the Doe robbery], if I thought [Esters] did it. But my job is to pursue justice, and a big part of that is charging the appropriate person with the crime."

- "We believe Cornell McKay committed this robbery, we have no doubt about that. The only reason we're not going to trial is because the victim does not want to go forward."

- "I definitely would like to have another trial, because I believe that this is the correct defendant for this crime."

McKay argues that these statements are defamatory because they imply that he, not Esters, committed the Doe robbery, and that the evidence supported his continued prosecution for that crime at a second trial. In response, Joyce contends that her comments were merely statements of opinion, and that they are thus absolutely privileged. McKay further alleges that Ryan assisted Joyce in preparing her statements to the media, and that during an interview with a local television station, Ryan stated:

These matters were investigated, they were researched, and we really believe that all of those things that have been brought up have been litigated, and the right person, Cornell McKay was held accountable. At any point if there were doubts from [the Circuit Attorney's Office], we would have addressed that.

Joyce also appeared on a local radio show to discuss McKay's alleged involvement in the Doe robbery. As relevant, Joyce made the following allegedly defamatory statements during that radio interview:

- During McKay's first trial, the jury was presented with evidence that a call had been made from Doe's cell phone to Perry's cell phone only 25 minutes after the Doe robbery.

- The jury also knew of Esters, that he was a known "cell phone stealer," heard Perry's testimony, considered McKay's alternative-perpetrator defense, and "took that into consideration, but . . . were so still so swayed by the eyewitness testimony and certainty of those witnesses" that they found McKay guilty.

- It was "possible that [McKay and Esters] were working together" and represented that "there are some connections between the two."

According to McKay, these statements necessarily imply the existence of other undisclosed objective facts known to Joyce and Ryan which support the false statement that Plaintiff committed the Doe robbery.

Under Missouri law, the plaintiff in a defamation claim must allege facts tending to show the (1) the defendant made a defamatory statement, and (2) that defendant is not entitled to any privileges that shelter her from legal action. Pape v. Reither, 928 S.W.2d 376, 380-81 (Mo. Ct. App. 1996). Statements of opinion are absolutely privileged, even if they are made with malicious intent. Id. However, the privilege afforded statements of opinion does not apply where the statement of opinion necessarily implies the existence of undisclosed defamatory facts. Id. In deciding whether a statement is an opinion, a court must determine "whether a reasonable factfinder could conclude that the statement implies an assertion of objective fact." Castle Rock Remodeling, LLC v. Better Bus. Bureau of Greater St. Louis, Inc., 354 S.W.3d 234, 241 (Mo. Ct. App. 2011). The determination of whether an ordinary person would have treated a statement as one of fact or as one of opinion requires an examination of the totality of the circumstances, including the general tenor of the entire statement, the defendant's use of hyperbolic or figurative language, and the statement's susceptibility to being proven true or false. Id.

The Court concludes that Joyce's statements did not imply an assertion of objective fact. First, her statements were made in the context of her decision, as Circuit Attorney, not to retry McKay for the Doe robbery in light of the fact that Doe had declined to testify against him at a second trial. In this context, Joyce's statements cannot reasonably be construed as implying an assertion of fact regarding McKay's guilt; rather, her statements imply her trust in the verity of Doe's prior eyewitness identification and testimony at the first trial, over the contrary evidence tending to vindicate McKay and inculpate Esters. Moreover, a reasonable factfinder would conclude that Joyce's statements reflected her opinion that McKay had committed the Doe robbery, and that she would have proceeded to retry McKay had Doe—who had identified McKay as her assailant—agreed to testify at a second trial. Joyce's statements did not imply that

27

she was privy to additional evidence tending to inculpate McKay in the Doe robbery; rather, she stated that, given the evidence that would be available to her at a second trial, she had decided not to retry McKay. See Pape, 918 S.W.2d at 380 ("It is my position that you participated in fraudulent and or (sic) illegal acts" was non-defamatory statement of opinion protected under First Amendment). The Court further notes that Joyce's statements were not susceptible to being proven true or false at the time she made them; the Missouri Court of Appeals had not declared McKay "innocent" of the Doe robbery, but had instead reversed his conviction on evidentiary grounds, leaving Joyce the choice of dismissing the charges against McKay or retrying him. Accordingly, the Court will dismiss McKay's defamation claims against Joyce, Ryan, and SC Ryan Consulting, LLC.

In sum, Defendants Joyce, Ryan, and SC Ryan Consulting LLC's motion to dismiss will be granted in part and denied in part. The Court will dismiss all claims against Ryan and SC Ryan Consulting. The defamation claims against Joyce, and the § 1983 claims against her in her individual capacity will also be dismissed. The motion will be denied to the extent it seeks dismissal of McKay's § 1983 claims against Joyce in her official capacity.

## V. MOTION TO STRIKE

Joyce has moved to strike paragraph 157 of McKay's second amended complaint, asserting that the allegations are irrelevant to his claims, bear no relation his alleged constitutional deprivations, and serve only to besmirch the reputations of Joyce and the Circuit Attorney's Office (Docs. 85-86.) At issue are McKay's allegations that Joyce has implemented the following as official policies, practices, and customs of the Circuit Attorney's Office: vindictively prosecuting criminal defendants by threatening to initiate more serious charges if the defendant exercises his right to trial; using the media to taint the jury pool in criminal cases, and

to heighten public condemnation of criminal defendants and dramatize the plight of victims; issuing arrest warrants when the charges are not provable beyond a reasonable doubt; overriding the decisions of subordinate prosecutors who have determined that an arrest warrant is not warranted; continuing criminal proceedings up to trial with knowledge that the defendant could not be proven guilty beyond a reasonable doubt for the purpose of extending pretrial incarceration of defendants; and retaliating against subordinate prosecutors who complain about these unconstitutional practices, policies and customs. In response, McKay argues that paragraph 157 demonstrates that the Circuit Attorney's Office has exhibited a pattern of violating criminal defendants' constitutional rights (Doc. 101).

A court may strike from a pleading any redundant, immaterial, impertinent, or scandalous matter. Fed. R. Civ. P. 12(f). Courts enjoy liberal discretion to strike pleadings under Rule 12(f); however, striking a party's pleading is an extreme and disfavored measure. BJC Health System v. Columbia Cas. Co., 478 F.3d 908, 917 (8th Cir. 2007). McKay has not linked the allegedly unconstitutional policies and customs set forth in paragraph 157 to the constitutional harms he alleges he has suffered. The polices and customs in paragraph 157 bear no relation to the misconduct at issue in this case, and the Court thus concludes that they are impertinent to this action. As such, the motion to strike will be granted.

## VI. CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that Defendant City of St. Louis's Motion to Dismiss (Doc. 83), Defendant Joseph Spence's Motion to Dismiss (Doc. 89), and Defendants Bettye Battle-Turner, Richard Gray, Thomas Irwin, Francis Slay, and Erwin Switzer's Motion to Dismiss (Doc. 91) are **DENIED**.

**IT IS FURTHERED ORDERED** that Defendants Joyce, Ryan, and SC Ryan Consulting, LLC's Motion to Dismiss (Doc. 87) is **GRANTED IN PART**. The claims against Ryan and SC Ryan Consulting, LLC are **DISMISSED**. The defamation claim against Joyce, and the § 1983 claims against her in her individual capacity are **DISMISSED**. The motion is **DENIED** to the extent it seeks dismissal of McKay's § 1983 claims against Joyce in her official capacity.

**IT IS FINALLY ORDERED** that Defendant Joyce's Motion to Strike (Doc. 85) is **GRANTED**. Paragraph 157 of the Second Amended Complaint is **STRICKEN**.

Dated this 2nd day of September, 2016.

_____
JOHN A. ROSS
UNITED STATES DISTRICT JUDGE