**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CORNELL MCKAY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:15-cv-01315-JAR |
| | ) | |
| CITY OF ST. LOUIS, MISSOURI, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court on three Motions for Summary Judgment, filed by: St. Louis Metropolitan Police Department ("SLMPD") Officers Anthony Boettigheimer, Christian Stamper, and David Rudolph (the "Police Defendants"), and St. Louis City Board of Police Commissioners ("the Board") members Richard Gray, Thomas Irwin, Bettye Battle-Turner, Erwin O. Switzer, and Francis G. Slay (the "Board Defendants") (Doc. 182); Missouri Department of Probation and Parole Officer Joseph Spence (Doc. 196); and the City of St. Louis ("the City") (Doc. 198). Each motion includes a statement of material facts. (Docs. 186, 199, 200.) Plaintiff has filed a joint response opposing the first two motions with responses to their respective statements of fact and a statement of additional facts. (Doc. 211.) Plaintiff separately filed a response in opposition to the City's motion and a response to its statement of facts. (Doc. 216.)

Also pending are three motions to strike or exclude expert testimony. (Docs. 189, 190, 201.) Those motions are fully briefed and ready for disposition. Because all of these motions involve similar legal issues and intertwined facts, the Court will address them together.

# Background[1]

On August 10, 2012, around 8:30 p.m., Jane Doe arrived home to her condominium in the Central West End neighborhood of St. Louis. As Doe was exiting her vehicle, a man walked past her. She walked to the trunk to retrieve her purse and noticed the man walking back towards her. When Doe closed the trunk, the man made eye contact and said, "Give me your money." He pointed a gun at her. Doe agreed to cooperate and told the robber that she had a cell phone in the front seat. The robber followed her there, took Doe's phone, took $50 in cash, and ran off.

Doe's husband John Doe was walking the couple's dog when the robbery took place. During the walk, he nodded to a man who passed him on the sidewalk. As John Doe was finishing the walk, he saw the same man roughly one block from home. The two made eye contact and the man ran off. When John got home and Jane told him what had happened, he called the police.

A SLMPD sergeant, two detectives, a patrol officer, and an Evidence Tech Unit employee responded to the scene. Doe told the officers that she had gotten a good look at the robber's face and described him as a light-skinned African-American male, 16-20 years old, 6'3" tall, and weighing 150 pounds. After talking to police, Doe left her cell phone activated so its use could be tracked. She eventually provided the police with two spreadsheets of calls that had been made from her phone after the robbery, which she had created by copying and pasting from her online account records on Sprint's website. On August 16, 2012, police conducted a "TLO

---

[1] Facts are taken from the Defendants' statements of material fact, as responded to and supplemented by Plaintiff.

search" using the telephone numbers listed on Doe's spreadsheets. One of the numbers dialed was linked to an address associated with a man named Lamont Carter.

On August 18, 2012, a man shot and killed Megan Boken during an attempted armed robbery in the Central West End, less than three blocks from Doe's condominium. The next day, August 19, homicide detectives conducted a computer search that alerted them that the deadly robbery of Boken was similar to the Doe robbery in both manner and location. The day after that, on August 20, homicide detectives met with Defendant Stamper and asked for Doe's spreadsheets, hoping they might contain something to assist with the Boken investigation.

Immediately after Stamper's August 20 meeting with homicide detectives, the Doe case was assigned to Defendant Boettigheimer. That day, Boettigheimer ran several computer searches using Lamont Carter's addresses and phone numbers. The searches returned a number of associates, but only one person—Plaintiff Cornell McKay—matched the Does' description of Jane Doe's robber. Boettigheimer generated a photo line-up using Plaintiff's photo and five others and showed it to the Does. Jane Doe identified Plaintiff as her robber. John Doe did not recognize any of the six men. Boettigheimer issued a "wanted" notice for Plaintiff.

On August 21, 2012, Plaintiff surrendered himself, accompanied by local Reverend Chris Douglas, who provided an alibi for Plaintiff and identified several other alibi witnesses. Boettigheimer interviewed Plaintiff about both the Doe robbery and the Boken murder. Plaintiff voluntarily submitted to a polygraph examination but officers only asked him about the murder case. Boettigheimer then organized a live line-up at which both Jane and John Doe independently identified Plaintiff as the robber. Thereafter, Plaintiff was booked for, and later charged by the Circuit Attorney with, first-degree robbery and armed criminal action.

Representatives of the Circuit Attorney's Office commented publicly that the investigation had been successful.

Meanwhile, homicide detectives had been running their own computer searches using the Doe spreadsheet. Their investigation led them to Kaylin Perry, whose number had been dialed from Doe's phone numerous times in the first forty minutes after the robbery. On August 21, the homicide detectives brought Perry in for questioning, and she told them that her boyfriend, Keith Esters, had come home one night with the phone and $50. Perry also told the homicide detectives that Esters had said that he murdered Boken. Perry told the detectives that she did not know Plaintiff and that he had not been involved in either crime. Esters ultimately confessed to the Boken murder but did not admit to the robbery of Jane Doe. Esters did say that he did not know Plaintiff and that Plaintiff was not involved in the murder.

On August 22, 2012, homicide detectives asked Boettigheimer and his partner Defendant Rudolph to come to the station. When the homicide detectives relayed what Perry had told them, Boettigheimer and Rudolph interviewed Perry themselves. Perry told the officers that she and Esters had sold the phone at a gas station. Although Esters was in the custody of the homicide detectives, Boettigheimer and Rudolph did not interview him. Boettigheimer and Rudolph tracked down the person who had purchased the phone at the gas station, who confirmed that he had bought it from Esters. The next day, Boettigheimer and Rudolph retrieved the phone. The officers also met with Plaintiff's proffered alibi witnesses.

Based on the identifications of Plaintiff ad the person who committed the robbery and despite Plaintiff's cooperation, the statements from the homicide detectives, Perry, Esters, and the gas station employees, the Circuit Attorney proceeded to trial on the Doe robbery and, on December 12, 2013, a jury convicted him. The court sentenced Plaintiff to twelve years in

prison. On appeal, the Missouri Court of Appeals vacated the convictions on the ground that the trial court erred by granting the prosecution's motion to exclude any reference to Esters and remanded the case. *State v. McKay*, 459 S.W.3d 450, 452 (Mo. Ct. App. 2014). Prosecutors publicly stated that they believed Plaintiff had robbed Doe and wished to retry him, but because Doe did not want to testify again, the State dropped the case and Plaintiff was released on May 7, 2015.

On August 25, 2015, Plaintiff filed this suit against the Police Defendants, the Board, Plaintiff's probation officer, the City, SC Ryan Consulting and its owner, Susan Ryan—who had assisted the City in public relations matters—and Circuit Attorney Jennifer Joyce. Ryan and her business were dismissed by court order (Doc. 107), and the Circuit Attorney was dismissed with prejudice by stipulation (Doc. 171). Plaintiff proceeded against the remaining defendants on seven claims: Count I – Destruction of Evidence; Count II – Fabrication of Evidence; Count III – Reckless or Intentional Failure to Investigate; Count VI – Conspiracy to Deprive Plaintiff of Constitutional Rights; Count V – Liability under *Monell v. Dep't of Soc. Servs. of City of New York*; Count VI – State Law False Arrest; and Count VII – State Law Malicious Prosecution. (Docs. 1, 78.) The Police and Board Defendants filed a joint motion for summary judgment, arguing that they are protected by qualified immunity; that there is no evidence of wrongdoing, that Plaintiff's arrest was supported by probable cause; and that there is no evidence of policy or custom which would make the Board members liable for the officers' alleged misconduct. (Docs. 182, 185.)

Probation officer Spence separately moved for summary judgment, arguing that he is also entitled to qualified immunity and that there is no evidence he violated Plaintiff's constitutional rights or that he conspired with others to do so. (Docs. 169, 197.)

In its motion for summary judgment, the City argues that it is not liable for the Police or Board Defendants' alleged misconduct because between 1982 and 2012, "[t]he City had no authority or control over the operations of the SLMPD. . . . During that period of time . . . [state law] barred the City of St. Louis from interfering 'with the powers or the exercise of the powers' of the Board." *Allen v. City of St. Louis, Mo.*, No. 4:14 CV 1398 RWS, 2015 WL 3407652, at *2 (E.D. Mo. May 26, 2015) (*see also*, Doc. 212 at 1-2).

## Legal Standards

Pursuant to Federal Rule of Civil Procedure 56(a), a court may grant a motion for summary judgment only if "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The burden is on the moving party. *City of Mt. Pleasant, Iowa v. Associated Elec. Co-op. Inc.*, 838 F.2d 268, 273 (8th Cir. 1988). In ruling on a motion for summary judgment, all reasonable inferences must be drawn in a light most favorable to the non-moving party. *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005). The evidence is not weighed and no credibility determinations are made. *Jenkins v. Winter*, 540 F.3d 742, 750 (8th Cir. 2008).

Once the moving party demonstrates that there is no genuine issue of material fact, the nonmovant must do more than show there is some doubt as to the facts. *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, the nonmoving party bears the burden of setting forth affirmative evidence and specific facts by affidavit and other evidence showing a genuine factual dispute that must be resolved at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Celotex*, 477 U.S. at 324. "A dispute about a material fact is 'genuine' only 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Herring v. Canada Life Assur. Co.*, 207 F.3d 1026, 1030 (8th Cir. 2000)

(quoting *Anderson*, 477 U.S. at 248). Judgment as a matter of law is appropriate only when "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party." Fed. R. Civ. P. 50(a).

## Analysis

Section 1983 provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." 42 U.S.C. § 1983. "The first step in a § 1983 analysis is to isolate the precise constitutional violation which is alleged." *Rogers v. City of Little Rock, Ark.*, 152 F.3d 790, 796 (8th Cir. 1998) (citations omitted).

I.  *Section 1983 Claims against the Police Defendants and Spence in their individual capacities.*

"The essential elements of a § 1983 claim are (1) that the defendant(s) acted under color of state law, and (2) that the alleged wrongful conduct deprived the plaintiff of a constitutionally protected federal right." *Schmidt v. City of Bella Villa*, 557 F.3d 564, 571 (8th Cir. 2009) (citing *DuBose v. Kelly*, 187 F.3d 999, 1002 (8th Cir. 1999)). "A public official 'acts under color of law when he misuses power possessed by virtue of . . . law and made possible only because he was clothed with the authority of . . . law.'" *Ramirez-Peyro v. Holder*, 574 F.3d 893, 900 (8th Cir. 2009) (quoting *United States v. Colbert*, 172 F.3d 594, 596 (8th Cir. 1999)). "[A] public official acts under color of law when that official 'abuses the position given to him by the State.'" *Id*. (quoting *West v. Atkins,* 487 U.S. 42, 49-50 (1988)).

That said, government actors are entitled to qualified immunity when they can show that their conduct did not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Treats v. Morgan*, 308 F.3d 868, 871 (8th Cir. 2002)

(quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Courts ask two questions when resolving a government official's qualified-immunity claim:  "[Do] the facts, taken in a light most favorable to the party alleging an injury, show a violation of a constitutional or statutory right?" and, if so, was that right "so clearly established that it would have been 'clear to a reasonable officer that his conduct was unlawful in the situation he confronted?'"  *Id.* at 871-72 (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)).  If the answer to either question is "No," the defendant is entitled to qualified immunity.

COUNT I:  Destruction and/or Suppression of Exculpatory Evidence
by Boettgiheimer, Rudolph, and Stamper,
in violation of the Fifth and Fourteenth Amendments.

Plaintiff alleges that the officers investigating the Doe robbery suppressed or destroyed evidence of his innocence.  Suppression of material exculpatory evidence is a violation of the Fourteenth Amendment's Due Process Clause.  *Brady v. Maryland*, 373 U.S. 83, 87 (1963).  The right to due process is "quite clearly established," *Anderson v. Creighton*, 483 U.S. 635, 639 (1987), and the deliberate, bad-faith failure to protect or produce exculpatory evidence is fatal to a claim of qualified immunity, *see White v. McKinley*, 519 F.3d 806, 814 (8th Cir. 2008).  To demonstrate a due process violation under *Brady*, a plaintiff must show that "(1) the prosecution suppressed evidence; (2) the evidence was favorable to the defendant; and (3) the evidence was material."  *United States v. Tate*, 633 F.3d 624, 630 (8th Cir. 2011) (quoting *United States v. Keltner*, 147 F.3d 662, 673 (8th Cir. 1998)).  Plaintiff must also show that the suppression was done in bad faith.  *White*, 519 F.3d at 814.

Plaintiff specifically asserts that the Police Defendants:  failed to tell the defense about the calls made to Perry from Doe's phone shortly after the robbery; failed to preserve the phone itself, which was damaged or destroyed before Plaintiff's defense attorneys could examine it ahead of trial; conducted overly suggestive identifications, even after learning of Esters; failed to

preserve surveillance videos; failed to tell the defense about Perry's statements regarding Esters's involvement in the Doe robbery; failed to share Perry's statements that she did not know McKay and that he was not involved in the robbery; and failed to produce text messages sent from Doe's phone that implicated Esters. (Doc. 78.) In addition, Plaintiff asserts that the Police Defendants "destroyed, lost, or purposely withheld" the video recording of Perry's interview by Boettigheimer and Rudolph. (Doc. 211 at 15, 53.) Plaintiff argues that bad faith can be inferred from the officers' actions *after* homicide detectives had told them about Perry; he implies that the Police Defendants must have been acting in bad faith because they knowingly ignored evidence of his innocence despite the urging of homicide detectives to investigate Esters for the robbery. (*Id.* at 52-54.)

Defendants respond that SLMPD expended a significant amount of investigative resources to solve the Doe robbery, including dispatching five investigators to the scene of the crime. (Doc. 185 at 8.) Their investigation simply led them to believe McKay was Doe's robber, supported by identifications by Jane and John Doe as well as interviews with five supposed alibi witnesses. (*Id.* at 6-12.) Moreover, the Does were shown Esters's photo and neither identified him. (*Id.* at 12.) In short, the Police Defendants assert that their actions indicate a good faith investigation. (*Id.*)

The Court concludes that Plaintiff's destruction and suppression arguments are not supported by the evidence. Some of Plaintiff's assertions are directly contradicted by his own admissions. For instance, he alleges that his counsel was not told about the calls to Perry or Perry's and Esters's statements about McKay, but in his response to the Police Defendants' statement of facts, Plaintiff admits that his counsel was in possession of Doe's official phone records from Sprint, "[t]wo DVDs and one CD of statements given by Kaylin [P]erry," and

"Keith Esters' recorded statements." (Doc. 211 at 20-25; Doc. 187-9 at 7-9.) Those items were in Plaintiff's counsel's possession by March 2013, more than eight months before his trial. These facts will not support Plaintiff's claimed *Brady* violation.

Plaintiff's suggestion that the Police Defendants (or some other co-conspirator) intentionally destroyed Doe's cell phone is likewise unsupported by the evidence. As an initial matter, there is no evidence to suggest that the phone was intentionally destroyed, let alone by or on behalf of the Police Defendants. Secondly, the Court cannot conclude that the phone contained any exculpatory evidence. Plaintiff's primary concerns were the suggestion that a picture of Plaintiff was found on Doe's phone and text messages sent from Doe's phone that implicated Esters. (*See* Doc. 211 at 57; Doc. 78.) But Plaintiff's counsel was informed by the Circuit Attorney's Office that it was "not in possession of any photographs of [Plaintiff] from [Doe's] phone" and that "[t]he detectives who investigated this case in addition to the detective who examined [Doe's] phone in your presence state that the SLMPD is not in possession of any photographs of [Plaintiff] from [Doe's] phone." (Doc. 187-9 at 8.) Further, Boettigheimer testified during his deposition that he believed the search of the phone was fruitless—that "nothing came off [Doe's] phone." (Doc. 211-2 at 20.) In light of the Circuit Attorney's pre-trial representation, Boettigheimer's testimony, and no evidence to the contrary, the Court concludes that there is insufficient evidence to conclude that the Police Defendants destroyed Doe's phone or that doing so resulted in the suppression of any exculpatory evidence.

In the same letter, the Circuit Attorney's Office stated that it was "not in possession of any surveillance video of the robbery and knows of none that were allegedly shown to defendant as he has stated." (Doc. 187-9 at 8.) In addition, it represented that "[a]ll detectives of the SLMPD who spoke with defendant have denied showing defendant any video before, during or

after any interview with him." (*Id*.) Plaintiff's self-serving but unsupported allegation that the Police Defendants suppressed or destroyed surveillance video cannot support a *Brady* claim in the face of contrary evidence.

Next, Plaintiff asserts that the Police Defendants "[did] not allow [Doe] to view her real robber close in time to the robbery." (Doc. 78.) He apparently references the February 25, 2013, photo line-up that included a picture of Esters. (*See* Doc. 187-1 at 41.) At that meeting, Jane Doe stated that Esters "resembled the individual who robbed her at first" before distinguishing his eyebrows, complexion, and facial hair. (*Id*.) John Doe did not recognize any of the six photographs. (*Id*.) The Court notes, however, that the Does had participated in two earlier line-ups on August 20 and 21, shortly after the robbery and before the homicide detectives had notified them of their suspicions surrounding Esters, in which both had identified Plaintiff as the robber. Moreover, Plaintiff's counsel was in possession of a police record documenting the February 25 line-up and Jane Doe's statements well in advance of Plaintiff's criminal trial, so Plaintiff was well-equipped to challenge the identification at trial.

As to any video recording of Perry's interview, the Court finds that there is insufficient evidence to conclude that the Police Defendants "destroyed, lost or purposely withheld" anything, as Plaintiff argues. (Doc. 211 at 15.) Indeed, Plaintiff's argument relies entirely on inference, based on Rudolph's deposition testimony, in which he states that it is his understanding that every interview in the homicide office is automatically recorded. (*See* Doc. 211-14 at 36:16-37:8.) The Court does not consider testimony by a robbery detective about the homicide unit's video-recording protocol to be strong evidence absent some additional evidence that he had prior experience or specialized knowledge of the procedures. Moreover, unlike many § 1983 cases alleging mishandling of evidence, Plaintiff does not assert a department-wide

conspiracy to violate his constitutional rights; to the contrary, he consistently holds up the homicide detectives as the standard for a thorough and constitutional investigation. Given that any video recording of Perry's interview would have been in the custody of the homicide unit and that Plaintiff makes no argument that someone in the homicide unit acted in concert with the Police Defendants, the Court finds it difficult to reach Plaintiff's asserted conclusion that the recording was "destroyed, lost or purposely withheld." (*Id.* at 15.) Lastly, as noted above, Plaintiff's counsel was given "[t]wo DVDs and one CD of statements given by Kaylin [P]erry" before trial. (*Id.* at 25.) Plaintiff offers no evidence from which the Court could conclude that the recorded interview included any different or additional information or that such information would have been exculpatory.

Ultimately, while the Court notes that evidence of an alternative suspect was material to Plaintiff's case, *see Genesis Ins. Co. v. City of Council Bluffs*, 677 F.3d 806, 808 (8th Cir. 2012) (citing *Harrington v. State*, 659 N.W.2d 509, 524 (Iowa 2003)), the Court cannot conclude, as a matter of law, that the facts of this case, even when viewed in the light most favorable to the Plaintiff, demonstrate a viable claim that the Police Defendants suppressed or destroyed exculpatory evidence. As a result, the Court concludes that the Police Defendants are entitled to summary judgment on Count I.

COUNT II: Fabrication of Evidence
by Boettgiheimer, Rudolph, Stamper, and Spence
in violation of the Fifth and Fourteenth Amendments.

Plaintiff next alleges that the Police Defendants fabricated evidence in an attempt to frame him. (Doc. 78 at 27.) Due process "prevents the government from engaging in conduct that shocks the conscience or interferes with rights implicit in the concept of ordered liberty." *Weiler v. Purkett*, 137 F.3d 1047, 1051 (8th Cir. 1998) (citing *United States v. Salerno*, 481 U.S. 739, 746 (1987)). Courts will find a substantive due process violation when the alleged conduct

violates "judicial notions of fairness," or is "offensive to human dignity." *Id.* (quoting *Weimer v. Amen*, 870 F.2d 1400, 1405 (8th Cir. 1989)). "[A] purposeful police conspiracy to manufacture, and the manufacture of, false evidence" violates substantive due process. *Moran v. Clarke*, 296 F.3d 638, 647 (8th Cir. 2002).

Plaintiff accuses the Police Defendants of coaching the Does to identify Plaintiff; intentionally omitting early calls made to Perry and others from the excel spreadsheets detailing the use of Doe's cell phone after the robbery; stating that Doe's stolen cell phone contained a photograph of Plaintiff; and producing a watered-down version of Perry's statement that elided Esters' alleged involvement in the robbery. (Docs. 78 at 27, 211 at 57.) Thereafter, Plaintiff asserts, Spence relied on that fabricated evidence in support of his report recommending that Plaintiff's parole be revoked. (Doc. 78 at 27.)

The Police Defendants again argue that they are entitled to summary judgment—or at least qualified immunity—because there is no evidence of fabrication or bad faith. As to the claim that they coached the Does, there is no direct or circumstantial evidence to support such a conclusion. Further, Police Defendants note that there is no constitutional right to be free of unduly suggestive lineups. *Pace v. City of Des Moines*, 201 F.3d 1050, 1055 (8th Cir. 2000). Only when the lineup deprives the accused of a fair trial will it offend due process. *See United States v. Donelson*, 450 F.3d 768, 773 (8th Cir. 2006) (explaining that the due process issue arises when the state attempts to admit a lineup and the defendant objects). Courts apply a two-part test: (1) was the identification impermissibly suggestive; and (2) under the totality of the circumstances, did the suggestive procedures create "a very substantial likelihood of irreparable misidentification." *United States v. Murdock*, 928 F.2d 293, 297 (8th Cir. 1991) (quoting *Manson v. Brathwaite*, 432 U.S. 98, 116 (1977)). Courts consider a number of factors in

determining whether the second part is met: "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the time between the crime and the confrontation." *Id.* (quoting *Manson*, 432 U.S. at 114).

Plaintiff's asserted evidence of coaching is largely limited to his belief that "it is implausible that there was no amount of persuasion" given that Doe identified the wrong person. (Doc. 211 at 57.) Plaintiff goes on to surmise that Doe was ostensibly in on the falsification of the identification because she told police that Esters bore a "slight resemblance" to her robber before noting that his eyebrows and facial hair were wrong. (*Id.* at 58.) The Court concludes that, in the absence of any evidence of this, the argument is insufficient to support a charge of coaching the witness. In addition, the Court notes that Doe told officers that she had gotten a good look at her robber's face and expressed a high degree of certainty both times she identified Plaintiff. Finally, the Court notes that the trial court denied Plaintiff's pretrial motion to suppress the identifications. While the Court recognizes that excluding an identification at trial and proving a § 1983 claim rely on different standards, it believes the trial court's denial bolsters this Court's conclusion that there is no evidence of undue influence. The Court therefore finds that the Police Defendants and Spence are entitled to summary judgment as to this allegation.

Next, Plaintiff accuses the Police Defendants of producing an excel spreadsheet purporting to detail the calls and texts sent from Doe's cell phone following the robbery but omitting several calls that suggested that Esters possessed the phone. (Doc. 211 at 57.) The Police Defendants respond that the excel spreadsheet they had was created by Doe and that *she* failed to include the calls, not the detectives. (Doc. 185 at 15.) In support, they assert that the

Circuit Attorney's Office has an identical copy, received from Doe, which did not include the early calls. (*Id.*; Doc. 187-8.) Plaintiff admits that the call logs were created by Doe and sent to the Police Detectives but adds that the Circuit Attorney's Office was in possession of the complete Sprint records for all calls made from Doe's phone. (Doc. 211 at 20-21.)

The Court finds that Plaintiff's allegation regarding a doctored phone log is not supported by the evidence, even when viewed in the light most favorable to him. Of note, the emails sent by Doe to both the Police Detectives and the Circuit Attorney's Office begin with Doe's last call, placed at 8:25 p.m. on the night of the robbery, and then jump to 11:04 a.m. the next day. (Doc. 187-88.) Doe never included the calls placed to Perry in the first thirty-to-forty minutes after the robbery and therefore it cannot be said that the Police Defendants omitted them. While it is true that the Circuit Attorney's Office had the complete records, it is clear that Plaintiff's counsel also had them prior to trial. *See McKay*, 459 S.W.3d at 455 ("At the conclusion of the defense's case-in-chief, defense counsel sought to introduce *certified call records for Victim's cell phone account it had subpoenaed from Sprint* to establish the cell phone's activity after the robbery.") (emphasis added). Put simply, the evidence does not support a conclusion that the Police Defendants omitted phone calls, altered the spreadsheets, or otherwise prevented Plaintiff from accessing the complete records. (Doc. 170.) Thus, the Court concludes that Plaintiff's fabrication allegation based on the spreadsheet fails as a matter of law and finds that the Police Defendants and Spence are entitled to summary judgment as to this allegation as well.

Lastly, Plaintiff argues that Spence[2] falsely stated in his revocation report that a picture of Plaintiff was found on Doe's phone—a claim that cannot now be corroborated because the

---

[2] In his Second Amended Complaint, Plaintiff states that "Defendant Spence prepared and filed with the Court a fabricated probation revocation report containing untruthful information that

phone has since been damaged or destroyed. (Doc. 78 at 27.) Spence, who was Plaintiff's assigned probation officer, was notified by police officials that Plaintiff had been arrested for robbery. (Doc. 197 at 2.) Plaintiff denied any involvement, but Spence later learned that the victim had identified Plaintiff as her robber. (*Id.*) In addition, an investigator in the Circuit Attorney's Office told Spence that there was a picture of Plaintiff on the stolen phone. (*Id.*) Based on the arrest, the victim's identification, and the investigator's statement about the picture, Spence filed a revocation report recommending that Plaintiff's probation be revoked. (*Id.*) Plaintiff's probation was revoked and a second judge set his bond at $50,000. (*Id.*)

Spence asserts that he filed the report, including the reference to the alleged photograph, in good faith and that therefore he is entitled to qualified immunity. (Doc. 197 at 8-9.) At worst, Spence asserts, he negligently included inaccurate information, and he argues that negligence is insufficient to support § 1983 liability. (*Id.* at 5-6 (citing *Clemons v. Armontrout*, 477 F.3d 962, 966 (8th Cir. 2001) (holding that, at most, a failure to investigate key factual allegations amounted to negligence)).) Moreover, Spence submitted a corrected report to the probation court immediately after learning that the photograph may not exist. (Doc. 197 at 9-10.)

The Court agrees with Spence. Plaintiff has failed to establish that a probation officer has an affirmative duty to corroborate or confirm the truth of an investigation before relying on that investigation in submitting a revocation report. To the contrary, in most cases "the probation officer is duty bound to report wrongdoing by the [probationer] when it comes to his attention." *Minnesota v. Murphy*, 465 U.S. 420, 432 (1984) (quoting *Fare v. Michael C.*, 442

---

photographs of Plaintiff appeared on the victim's stolen phone," (Doc. 78 at 27), but in his Memorandum in Opposition he states that "*Defendants* falsely stated that Cornell McKay's picture . . . was on the phone of Jane Doe" (Doc. 211 at 57). The Court construes the claim as written in the Complaint—as relating only to Spence.

U.S. 707, 720 (1979)) (alterations in original).  In any event, the Court finds that the reference to the photograph was, at most, negligent and that Spence's immediate correction is compelling evidence of his good faith.  Accordingly, the Court finds that Spence is not liable under § 1983 and, moreover, is entitled to qualified immunity on this count.

COUNT III:  Reckless or Intentional Failure to Investigate
by Boettgiheimer, Rudolph, Stamper, and Spence
in violation of the Fourteenth Amendment.

Next, Plaintiff accuses the Police Defendants—and, by incorporating the officer's factual allegations into his revocation report, Spence—of intentionally or recklessly ignoring substantial evidence of Plaintiff's innocence.  (Doc. 78 at 28-30.)  Plaintiff specifically asserts that those Defendants:  failed to take seriously or follow up with alibi witnesses; failed to call all of the telephone numbers on Doe's spreadsheet; and failed to show the Does a photo line-up that included Esters immediately following his arrest by the homicide detectives.

An intentional or reckless failure to investigate that shocks the conscience will support § 1983 relief.  *Cooper v. Martin*, 634 F.3d 477, 481 (8th Cir. 2011) (citing *Brockinton v. City of Sherwood, Ark.*, 503 F.3d 667, 672 (8th Cir. 2007)).  The Eighth Circuit has found that "the following circumstances indicate reckless or intentional failure to investigate that shocks the conscience: (1) evidence that the state actor attempted to coerce or threaten the defendant, (2) evidence that investigators purposefully ignored evidence suggesting the defendant's innocence, (3) evidence of systematic pressure to implicate the defendant in the face of contrary evidence." *Akins v. Epperly*, 588 F.3d 1178, 1184 (8th Cir. 2009).  In no event is negligence sufficient.  *Cooper*, 634 F.3d at 481.

The Court begins by finding that, for the reasons stated above, Spence is not liable for the allegedly unconstitutional investigation.  As explained, his conduct was at most negligent, and, in any event, his good faith entitles him to qualified immunity.  *Clemons*, 477 F.3d at 966.

The Court further concludes that Plaintiff has not alleged facts from which a jury could find that the Police Defendants intentionally or recklessly failed to investigate in a manner that shocks the conscience. Several facts carry special weight for the Court in reaching this conclusion.

First, the Court notes that it is the Circuit Attorney and not the SLMPD who decides when and how to charge a suspect. The role of the SLMPD is to gather evidence and present it to the Circuit Attorney for evaluation. There is no doubt that the Circuit Attorney was aware of the evidence regarding Esters because she moved to exclude it at trial. That evidence, gathered by the Police Defendants and given to the Circuit Attorney, was substantial:

> Esters owned a handgun like the one brandished by the robber; that clothes matching the description of those worn by the perpetrator were concealed under Esters's sofa; that Victim's phone was used to call Esters's girlfriend 30 minutes after the robbery; that the BP employees positively identified Esters as the individual who sold Victim's phone in the presence of Perry; that [Doe] recognized Esters as someone who resembled the man who robbed her, and that Esters attempted to steal a cell phone from a woman in the immediate vicinity eight days later.

*McKay*, 459 S.W.3d at 459. The fact that the Police Defendants investigated, gathered, and turned over to the Circuit Attorney all of this evidence is entirely inconsistent with Plaintiff's assertion that the Police Defendants ignored evidence of his innocence.

Second, the Court notes that Plaintiff seeks to prove by inference that the Police Defendants faced systematic pressure to implicate him; yet he offers no direct evidence that the Police Defendants were asked to do anything but a routine investigation. While it is true that members of the Circuit Attorney's Office made public statements regarding the investigation and that the case generated substantial attention in the community and the media, this is true of almost every high-profile case and is not, in itself, evidence of unconstitutional pressure to

implicate Plaintiff.  Further, the State's decision not to retry Plaintiff undermines his claim that the Circuit Attorney was committed to convicting him by any means necessary.

The Court recognizes that the investigation into the Doe robbery was not perfect and notes that, in light of the Missouri Court of Appeals' ruling and with the benefit of hindsight, there was substantial credible evidence that Esters had robbed Doe.  Still, the Court notes that both of the eye witnesses identified Plaintiff as Doe's robber and that none of the alibi witnesses satisfied the Police Defendants' suspicion.  There was certainly probable cause and substantial evidence against Plaintiff as reflected by the decision of the grand jury to indict and the trial jury to convict Plaintiff.  At most, the record supports a finding that the Police Defendants placed too much weight on evidence of Plaintiff's guilt and not enough on evidence of Esters's involvement.  It could be said that the Police Defendants' judgment was flawed, even negligent, but the record cannot support a finding that the Police Defendants intentionally or recklessly ignored evidence of Esters's guilt in a manner that shocks the conscience.  For these reasons, the Court finds that the Police Defendants have shown that they are entitled to judgment as a matter of law on Count III.

Although the Police Defendants are entitled to summary judgment on the merits of Count III, the Court additionally concludes that they are entitled to qualified immunity.  A criminal defendant's right to substantive due process and a fair investigation is so clearly established that it would have been clear to a reasonable officer in the Police Defendants' positions.  *Treats*, 308 F.3d at 871; *Anderson*, 483 U.S. at 639.  However, because the investigation did not violate a constitutional or statutory right, the Court finds that the Police Defendants are entitled to qualified immunity on this count.

COUNT IV:  Conspiracy to Deprive Plaintiff of his Constitutional Rights
by Boettgiheimer, Rudolph, Stamper, and Spence.

In his next count, Plaintiff accuses the Police Detectives and Spence of working together to intentionally commit the constitutional violations discussed above. (Doc. 78 at 30.) Conspiring to violate a person's constitutional rights gives rise to an independent cause of action. To succeed, Plaintiff must show "(1) that the defendant[s] conspired with others to deprive [Plaintiff] of constitutional rights; (2) that at least one of the alleged co-conspirators engaged in an overt act in furtherance of the conspiracy; and (3) that the overt act injured [Plaintiff]." *White*, 519 F.3d at 814 (citing *Askew v. Millerd*, 191 F.3d 953, 957 (8th Cir. 1999)). In addition, Plaintiff must "prove a deprivation of a constitutional right or privilege." *Id.*

For the reasons stated above, the Court concludes that the Police Defendants and Spence are entitled to summary judgment on Plaintiff's conspiracy claims because none of the underlying allegations of injury are supported by the record. *See Beck v. Prupis*, 529 U.S. 494, 508 (2000) (Stevens, J. dissenting) (quoting *Royster v. Baker*, 365 S.W.2d 496, 500 (Mo. 1963) ("A conspiracy cannot be inferred from the record, because nothing was done by the alleged conspirators which was unlawful."); *see also Royster*, 365 S.W.2d 500 ("Some wrongful act to the plaintiff's damage must have been done by one or more of the defendants."). Put simply, Plaintiff has not suffered a constitutional violation at the hands of the Police Defendants or Spence and therefore any claim that he was injured by a conspiracy to do so must fail. Likewise, because the Police Defendants and Spence are entitled to qualified immunity on those alleged constitutional violations, they are also protected from liability on the conspiracy claim.

## II. *Claims against the City and against the Police Defendants and Board Defendants in their official capacities.*

Plaintiff also sues the Police Defendants and Board Defendants in their official capacities, as well as the City, arguing that they are liable under 42 U.S.C. § 1983 for conduct that violated his constitutional rights. Plaintiff specifically alleges that the Defendants violated

his constitutional rights under the Fourteenth Amendment's Due Process Clause both in their investigation into the Doe robbery and their prosecution of Plaintiff.

At the investigation stage, Plaintiff alleges that the City had a policy, procedure, and custom of fabricating inculpatory evidence, suppressing or destroying exculpatory evidence, and intentionally failing to investigate potential leads that could have uncovered exculpatory evidence, as well as rewarding officer and agent misconduct by failing to enforce internal disciplinary proceedings, among other things.  (Doc. 78 at ¶ 156.)  At the prosecution stage, Plaintiff claims that the City had a policy, procedure, or custom of "using vindictive prosecutorial tactics to discourage accused persons of exercising their right to trial by threatening more serious charges," "using the media to taint juries and heighten public condemnation of defendants in criminal cases," issuing arrest warrants based on charges that would not be provable beyond a reasonable doubt, and retaliating against Assistant Circuit Attorneys who complained about the alleged misconduct.  (Doc. 78 at ¶ 157.)  In addition, Plaintiff alleges that the City failed to train or supervise investigative officers and prosecutorial staff in a way that would have prevented the alleged constitutional violations.  (Doc. 78 at ¶ 162-68.)

COUNT V – *Monell* Liability

"A suit against a government officer in his official capacity is functionally equivalent to a suit against the employing governmental entity."  *Veatch v. Bartels Lutheran Home*, 627 F.3d 1254, 1257 (8th Cir. 2010) (citing *Baker v. Chisom*, 501 F.3d 920, 925 (8th Cir. 2007)).  To hold the employing governmental entity—here, the City—liable for officers' misconduct, a plaintiff must show that "execution of [the municipality's] policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."  *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978).  So-called *Monell* liability may be

premised on the entity's (1) "official municipal policy," *id.* at 691; (2) unofficial "custom," *id.* at 690; or (3) a deliberate indifference demonstrated by a failure to train or supervise, *see City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989). *See also Bry v. City of Frontenac*, 2015 WL 9275661, at *7 (E.D. Mo. Dec. 18, 2015), *aff'd sub nom. Bry v. City of Frontenac, Mo.*, 660 F. App'x 485 (8th Cir. 2016). Plaintiff must also show that the policy, custom, or failure to train or supervise was "the *moving force* behind the constitutional violation." *Rogers v. City of Little Rock, Ark.*, 152 F.3d 790, 799 (8th Cir. 1998) (emphasis added).

### 1. Policy

To establish liability based on policy, Plaintiff must identify "an official policy, [or] a deliberate choice of a guiding principle or procedure made by the municipal officer who has final authority regarding such matters." *Mettler v. Whitledge*, 165 F.3d 1197, 1204 (8th Cir. 1999). Formal written policies may take the form of a "policy statement, ordinance, regulation, or decision officially adopted and promulgated by the municipality's governing body." *Angarita v. St. Louis City*, 981 F.2d 1537, 1546 (8th Cir. 1992).

The City argues that it cannot be held liable for any conduct by the Police or Board Defendants because, at the time of Plaintiff's arrest, the SLMPD was under state control and therefore the Police and Board Defendants were state employees. (Doc. 199 at 3.) Ordinarily, a government entity cannot be held responsible for unconstitutional conduct by actors not under its control, but Plaintiff cites *Johnson v. Board of Police Com'rs*, 370 F. Supp. 2d 892, 895 (E.D. Mo. 2005), and *Carroll v. Sisco*, No. 4:00CV00864, 2007 WL 209924 at *4 (E.D. Mo. May 30, 2007), which hold that a city can be held liable for conduct by employees of a separate government entity when the two are acting in concert to deprive persons of their constitutional rights. The Court therefore rejects the City's blanket argument that it cannot be held liable for the acts of the Police or Board Defendants.

That said, *Monell* liability cannot be premised on an *official policy* when the defendant does not have control or decision-making authority over the government actors who allegedly deprived the plaintiff of his constitutional rights. *Crigler v. City of St. Louis, Mo.*, 767 F. Supp. 197, 200 (E.D. Mo. 1991). The reasoning for such a rule is simple: "[when] neither the City nor its agents possess the authority to make official policy concerning the actions of the Board of Police Commissioners or individual police officers," *id.*, conduct by city officials cannot have been "the moving force behind the constitutional violation," *Rogers*, 152 F.3d at 799.

In his response to the City's statement of uncontroverted facts, Plaintiff asserts that "any action of the SLMPD while it was under state control succeeds to the City" by virtue of City Ordinance #69489. (Doc. 212 at 2-3.) But Plaintiff provides no legal support for that assertion and it is not clear to the Court whether the City's subsequent assumption of "responsibility, ownership, and liability as successor-in-interest for contractual obligations, indebtedness, and other lawful obligations of" the Board includes policy-based *Monell* claims that arose when the City lacked the decision-making authority necessary to implement formal policy. (*Id.* (quoting Ordinance #69489).)

In any event, Plaintiff's policy-based *Monell* claim fails on its merits because he fails to cite any record evidence illustrating the existence of a formal policy statement, ordinance, or decision officially adopted by the Board or City. In his response to the Police and Board Defendants' motions for summary judgment, Plaintiff baldly asserts the City's "past, present and ongoing tacit support for the unconstitutional policies, practices and customs" without identifying any substantive evidence to support that assertion. (Doc. 211 at 7.) Plaintiff repeatedly states that the officials named in the suit had final policymaking authority, implying that their decisions indicate the City's position on investigations and prosecutions, but he cannot

point to any evidence that illustrates the formal adoption by the City (or the State before it) of those decisions. Without providing evidence of a formal policy or official action to adopt the defendants' decisions, Plaintiff cannot show that any policy was the moving force or guiding principle behind the alleged constitutional violations.

### 2. Custom

When a plaintiff cannot identify a formal policy or decision giving rise to the allegedly unconstitutional conduct, he may still prove *Monell* liability when he can show that the City had a custom of ignoring unconstitutional behavior. *See Marchant v. City of Little Rock, Ark*, 741 F.2d 201, 204 (8th Cir. 1984). To establish *Monell* liability based on a custom, Plaintiff must demonstrate: (1) "a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees" significant enough as to have the force and effect of law; (2) "deliberate indifference to or tacit authorization of such conduct by the municipality's policy-making officials after notice to the officials"; and (3) "that the custom was the moving force behind the constitutional violation." *Robinson v. City of St. Louis, Mo.*, 2018 WL 1695534, at *13 (E.D. Mo. Apr. 6, 2018) (citations omitted). *See also Marchant*, 741 F.2d at 204 ("Plaintiff must show that a constitutional deprivation was visited pursuant to governmental custom even though such a custom has not received formal approval through the body's official decisionmaking channels.") (citation omitted); *Reasonover v. St. Louis Cty.*, Mo., 447 F.3d 569, 583-84 (8th Cir. 2006) ("An act performed pursuant to a custom that has not been formally approved by an appropriate decision[-]maker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law.") (citation omitted).

As noted above, the City can be held liable even though it had no direct control over the Police or Board Defendants so long as Plaintiff can show that they worked in concert to create or defend a custom of unconstitutional conduct. *Johnson*, 370 F. Supp. 2d at 895; *Carroll*, 2007

WL 209924 at *4. However, Plaintiff fails to establish the existence of any continuing, widespread, and persistent pattern of such conduct by the SLMPD, its Board, or City agents. He cites to *Johnson* and *Carroll* in support, but neither is dispositive. In *Johnson*, a group of homeless plaintiffs sued the City and the Board, alleging that the Defendants were unconstitutionally "removing and discouraging homeless people from remaining in the [downtown St. Louis] area." (Doc. 212 at 5-6.) In that case, the City moved to dismiss "because it ha[d] no legal authority to create policy for Defendant Police Board." 370 F. Supp. 2d at 901. This Court denied that motion, finding that "the fact that the Defendants are separate legal entities does not prevent them from acting in concert to deprive constitutional rights pursuant to a joint policy or custom." *Id*. at 902. The Court also held that the homeless plaintiffs' allegation that "that Defendant City of St. Louis developed, and acted together with Defendant Board of Police, to implement the policies responsible for . . . intimidating and driving homeless and homeless appearing people from downtown St. Louis," resulting in "a pattern of misconduct by Defendant City of St. Louis and its employees," was sufficient to survive dismissal. *Id*. In *Carroll*, this Court held that, "[t]aking the allegations as true, as I am required to do by the standard of review," a prisoner's claim that the "City of Saint Louis and the Police Board have tolerated and encouraged a pattern and practice of excessive police force against the citizenry" was sufficient to withstand a 12(b) motion to dismiss. 2007 WL 209924 at *4

The Court does not find *Johnson* or *Carroll* especially helpful in assessing the merits of Plaintiff's custom-based investigation claim because both of those cases dealt with motions to dismiss, which involve an entirely different standard than the one relevant to this motion for summary judgment. To survive a Rule 12(b)(6) motion to dismiss, a plaintiff need only allege the existence of a policy leading to unconstitutional behavior and all well-pleaded allegations are

accepted as true. *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). To survive a motion for summary judgment under Rule 56, a plaintiff must "go beyond the pleadings," *Celotex*, 477 U.S. at 324, and "set[] forth affirmative evidence and specific facts by affidavit and other evidence showing a genuine factual dispute that must be resolved at trial," and the court is required to view the evidence only in the light most favorable to the non-movant, *Liberty Lobby*, 477 U.S. at 249. Given the significantly different burdens and presumptions, the Court does not find either *Johnson* or *Carroll* to be especially good yardsticks for the merits of Plaintiff's custom-based *Monell* claim.

There is no evidence that the alleged conduct was part of a pattern of unconstitutional conduct. To illustrate such patterns, plaintiffs typically present evidence of a significant number of unresolved complaints against the police department or city to show that the city routinely ignores such allegations. *See Mettler*, 165 F.3d at 1205; *see Harris v. City of Pagedale*, 821 F.2d 499, 501-06 (8th Cir. 1987) (Plaintiff proved municipal custom of failing to investigate or act on citizen complaints of physical and sexual misconduct by officers by presenting detailed evidence consisting of testimony and written complaints identifying a particular police officer's prior misconduct and the city's failure to investigate or punish that conduct). Even then, a pattern of inaction is not always enough. *Robinson*, 2018 WL 1695534, at *17 ("A reasonable jury could not find, based on fifteen claims of police misconduct over an eleven-year period, that the Board ignored a widespread pattern of unreasonable searches and the use of excessive force.") That said, the "mere existence of previous citizens' complaints does not suffice to show a municipal custom"; Plaintiff must also show that the complaints had merit." *Id.* (citation omitted.) Plaintiff alleges that the Police Defendants mishandled the investigation into the Doe robbery, but he does not provide evidence to suggest that the investigation is indicative of any larger pattern of

unconstitutional behavior. He has therefore failed to go beyond the pleadings and provide affirmative evidence of a custom of unconstitutional investigatory conduct by the City, the Board, or the two working together.

Plaintiff's custom-based claim of an unconstitutional prosecution also fails. He again relies on conclusory allegations that the City maintained a widespread custom of misconduct by members of the Circuit Attorney's Office by their condoning and tacit approval of the presentation of false evidence, use of vindictive prosecutorial tactics to discourage accused persons of exercising their right to trial by threatening more serious charges, use of the media to taint juries and heighten public condemnation of defendants in criminal cases, issuance of arrest warrants based on charges that would not be provable beyond a reasonable doubt, and retaliation against Assistant Circuit Attorneys who complained about the purported practices. (Doc. 78 at ¶ 156-157.) But he offers only two marginally relevant cases in support of his assertion that his prosecution was unconstitutional. (Doc. 212 at 7.) In *State v. Robinson*, No. 1422-CR04227-01 (Mo. Cir. Ct. St. Louis City), the trial court dismissed the case because the prosecution used "vindictive prosecutorial tactics to discourage accused persons [from] exercising their right to trial by threatening more serious charges." (Doc. 212 at 7.) In *State v. Polk*, 415 S.W.3d 692, 696 (Mo. App. E.D. 2013), the Missouri Court of Appeals affirmed the conviction but expressed "doubt that using social media to highlight the evidence against the accused and publicly dramatize the plight of the victim serves any legitimate law enforcement purpose or is necessary to inform the public of the nature and extent of the prosecutor's actions" and was "concerned that broadcasting that the accused is a 'child rapist' is likely to arouse heightened public condemnation."

Even accepting *Robinson* and *Polk* as black letter legal principles, they do not support an inference of "a continuing, widespread, persistent pattern of unconstitutional misconduct" by Defendants. *Robinson*, 2018 WL 1695534, at *13. At most, Plaintiff has shown that he and one other defendant—Brandon Robinson—were victims of unconstitutional prosecutions[3]; he offers no affirmative evidence from which this Court could infer that his prosecution is indicative of a larger pattern of misconduct. Accordingly, Plaintiff cannot show that City custom was the moving force and guiding principle behind any alleged constitutional violations.

### 3. Failure to Train or Supervise

Finally, Plaintiff alleges that the City is liable for its failure to train and supervise the Police Defendants and city prosecutors. Plaintiff asserts that any training given was "pretextual and designed to provide cover for the de facto customs and practices of deliberately depriving large numbers of accused persons of their constitutional rights." (Doc. 78 at ¶ 166.) He specifically alleges "improper interview and evidence gathering techniques" and a failure to supervise and train "agents and employees in the techniques and procedures of reliably investigating and preserving evidence." (Doc. 78 at ¶ 156.)

In *Connick v. Thompson*, the Supreme Court made clear that "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." 563 U.S. 51, 61 (2011). Still, a municipality can be held liable under § 1983 for failing to train its employees when:

> (1) the city's training practices were inadequate; (2) the city was deliberately indifferent to the rights of others in adopting them, such that the failure to train reflects a deliberate or conscious choice by the city; and (3) an alleged deficiency in the training procedures actually caused the plaintiffs injury. To satisfy the standard, Plaintiff must demonstrate that in light of the duties assigned to specific officers . . . the need for more or different

---

[3] Notably, Plaintiff dismissed his § 1983 claims against the prosecutors involved in his criminal case. (Docs. 173.)

> training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the [municipality] can reasonably be said to have been deliberately indifferent to the need.

*Bry* at *9 (internal quotations and citations omitted). Failing to train the employees at all or doing so in a grossly negligent manner such that it will inevitably result in unconstitutional misconduct constitutes deliberate indifference on the part of the municipality. *Freeman v. Lockhart*, 503 F.2d 1016, 1017 (8th Cir. 1974).

The burden to establish a failure-to-train or -supervise claim is high: "Where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." *Szabla v. City of Brooklyn Park, Minn.*, 486 F.3d 385, 390 (8th Cir. 2007) (citation omitted). Plaintiff "must provide evidence that the [municipality] was on notice that its training procedures were inadequate and likely to result in violation of constitutional rights. *Larkin v. St. Louis Hous. Auth. Dev. Corp.*, 355 F.3d 1114, 1117 (8th Cir. 2004). There are two ways plaintiffs can show the municipality was on notice: "First, [plaintiff] may show that the failure to train is so likely to result in a violation of constitutional rights that the need for training is patently obvious. Second, [plaintiff] may show that a pattern of misconduct indicates that the [City's] responses to a regularly recurring situation are insufficient to protect the people's constitutional rights." *Id.* (internal quotations and citations omitted). A failure-to-supervise claim "may be maintained only if a defendant demonstrated deliberate indifference or tacit authorization of the offensive acts." *Liebe v. Norton*, 157 F.3d 574, 579 (8th Cir. 1998) (internal quotations and citation omitted).

Plaintiff says very little about his failure-to-train or -supervise claims in his response to the City's motion for summary judgment. (*See* Doc. 212.) He fails to identify any specific

evidence to support either claim. (*Id.*) In fact, Plaintiff cites only to case law and his own complaint. (Doc. 212.) Accordingly, the Court concludes that Plaintiff has failed to show that the City's failure to train or supervise the Police Defendants was the moving force behind any alleged unconstitutional behavior. *Celotex*, 477 U.S. at 324 (plaintiff must "set[] forth affirmative evidence and specific facts by affidavit and other evidence showing a genuine factual dispute that must be resolved at trial").

The Court further concludes that Plaintiff has failed to meet his burden of establishing the existence of a genuine dispute of material fact regarding his *Monell* claims, that the City is therefore entitled to summary judgment on all claims against it, and that the Police and Board Defendants are entitled to summary judgment on all claims against them in their official capacities.

## III.    *State Law Claims against the Police Defendants*

Plaintiff also accuses the Police Defendants of Missouri Law false arrest and malicious prosecution. (Doc. 78 at 38-40.) The Police Defendants argue that they are entitled to summary judgment because the grand jury's probable-cause finding precludes liability under either claim. (Doc. 185 at 20-21.)

COUNTS VI and VII – False Arrest and Malicious Prosecution
in Violation of Missouri Common Law
by Boettigheimer, Rudolph and Stamper.

"Under Missouri law to prevail on a claim for false arrest, also termed 'false imprisonment,' a plaintiff must show that the defendant confined the plaintiff without legal justification." *Zike v. Advance Am., Cash Advance Centers of Missouri, Inc.*, 646 F.3d 504, 512 (8th Cir. 2011) (citing *Highfill v. Hale*, 186 S.W. 3d 277, 280 (Mo. 2006) (en banc). A malicious-prosecution claim requires a six-part showing, including that Plaintiff was the subject

of a prosecution commenced by Defendants that lacked probable cause and that was ultimately terminated in his favor. *Hughes v. Aetna Ins. Co.*, 261 S.W.2d 942, 945 (Mo. 1953).

Ordinarily, the finding of probable cause by a grand jury creates a per se legal justification for an arrest and prosecution. *Zike*, 646 F.3d at 512 (citing *Fisher v. Wal-Mart Stores, Inc.*, 619 F.3d 811, 820 (8th Cir. 2010)); *King v. Ryals*, 981 S.W.2d 151, 154 (Mo. Ct. App. 1998). There is no dispute that a grand jury returned an indictment against Plaintiff, but he argues that the grand jury's probable-cause determination was invalid because it was premised on Defendants' incomplete investigation, fabrication of inculpatory evidence, and suppression of exculpatory evidence. (Doc. 211 at 66-68.) Plaintiff specifically notes that the Defendants failed to apprise the grand jury of Esters or Perry. (*Id.*)

"Missouri courts have consistently held that a grand jury indictment amounts to a prima facie showing that probable cause existed for the prosecution and that this presumption is conclusive *unless rebutted by evidence that false testimony was the basis of the charge* and that the falsity was discoverable upon reasonable investigation," *Anton v. Police Ret. Sys. of St. Louis*, 925 S.W.2d 900, 906 (Mo. Ct. App. 1996) (citing *Perry v. Dayton Hudson Corp.*, 789 S.W.2d 837, 841 (Mo. Ct. App. 1990)) (emphasis added). However, this Court has already found that Defendants are entitled to summary judgment as to Count II, in which Plaintiff alleges unconstitutional fabrication of evidence. Plaintiff therefore cannot show that the grand jury's indictment was invalid on that basis. In addition, prosecutors have no obligation to present—and grand jurors have no obligation to consider—exculpatory evidence. *United States v. Williams*, 504 U.S. 36, 53 (1992). Thus, Plaintiff cannot show that the probable-cause finding was invalid due to the prosecutor's failure to mention Esters or Perry. In short, the Court agrees with Defendants that the grand jury's indictment precludes relief on Counts VI and VII.

## Conclusion

For these reasons, the Court concludes that Defendants have demonstrated entitlement to summary judgment on all Counts. In addition, the Police Defendants and Spence are also entitled to qualified immunity on all Counts against them.

## Motions Regarding Plaintiff's Experts

The Court recognizes that there are pending motions to strike or exclude Plaintiff's three expert witnesses. (Docs. 189, 190, 201.) The Court also notes that the Defendants do not rely on those expert opinions in support of their summary judgment arguments. Regardless, the Court clarifies that, upon consideration, the experts' options do not alter the Court's conclusion that Defendants are entitled to summary judgment.

The federal rules of evidence and related case law require that an expert be qualified and that the expert's testimony be both relevant and reliable. *See* Fed. R. Evid. 702; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). An expert may be qualified by "knowledge, skill, experience, training, or education." Fed. R. Evid. 702; *Kumho Tire Co.*, 526 U.S. at 150-51. Relevance requires that the expert's testimony relate to an issue in the case and be useful to the trier-of-fact. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589–90 (1993). "[D]oubts regarding the usefulness of an expert's testimony" are resolved in favor of admissibility. *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 758 (8th Cir. 2006); *accord Johnson v. Mead Johnson & Co.*, 754 F.3d 557, 562 (8th Cir. 2014). "An expert's opinion should be excluded only if that opinion is so fundamentally unsupported that it can offer no assistance to the jury." *Synergetics, Inc. v. Hurst*, 477 F.3d 949, 956 (8th Cir. 2007) (internal quotation marks and citation omitted). To be relevant, the testimony must "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702.

Reliability hinges on the sufficiency of the facts or data on which the opinion is based, the dependability of the principles and methods employed, and the proper application of the principles and methods to the facts of the case. Fed. R. Evid. 702. If the opinion is based solely or primarily on experience, the witness must connect the experience to the conclusion offered, must explain why the experience is a sufficient basis for the opinion, and must demonstrate the appropriateness of the application of the experience to the facts. *Id.*, Advisory Committee Notes.

## I.      STAN V. SMITH – *Hedonic Damages*

Plaintiff intends to present the testimony of Dr. Smith, "a forensic economist and financial consultant of over forty years," in support of his claim for hedonic damages. *Streit v. Halverson*, No. 17-4225-CV-WJE, 2018 WL 3763811, at *2 (W.D. Mo. Aug. 8, 2018). Hedonic damages "attempt to compensate for the loss of the pleasure of being alive." DAMAGES, Black's Law Dictionary (10th ed. 2014). Defendants do not challenge Dr. Smith's qualifications but move to exclude his testimony on hedonic damages on the grounds that it will not assist the trier-of-fact and is based on unreliable methods. (Doc. 194.) Defendants specifically challenge Dr. Smith's use of the "willingness-to-pay" method by which he attempts to quantify a plaintiff's loss of the enjoyment of life and assign it a dollar value. (*Id*. at 3-4.)

The issue of hedonic damages is derivative of any constitutional violation Plaintiff may have suffered. In light of the Court's ruling that Defendants are entitled to summary judgment and qualified immunity, it concludes that Dr. Smith's testimony regarding damages is moot and that nothing in Dr. Smith's report affects the Court's analysis of Plaintiff's substantive § 1983 claims.

## II.      MICHAEL D. LYMAN – *Police Procedure*

Plaintiff intends to present the testimony of Dr. Lyman, a Ph.D. with "2000 hours of formal, in-service police training" sponsored by the FBI, DEA, and numerous state and local

agencies in support of his assertion that the Police Detectives' investigation fell short of the minimum standards and best practices for robbery investigations. (Expert Report of Michael D. Lyman at 2.) Defendants move to strike Dr. Lyman's report and exclude his testimony on the ground that his "opinions are based upon insufficient facts and data, as well as impermissible speculation and witness credibility determinations." (Doc. 192-1 at 2.)

While expert testimony on police procedure might be of some help to a jury, the Court finds that Dr. Lyman's opinion must be stricken because it is unreliable. For instance, he opines that the Police Detectives' investigation was flawed because they ignored evidence that Plaintiff was out of town when the Doe robbery took place. (Lyman Report at 26.) But there is no evidence that Plaintiff was out of town that day; in fact, Dr. Lyman notes in his report only four pages earlier that Plaintiff himself states that he was with local friends when the robbery occurred. (*Id.* at 22.) At the same time, Dr. Lyman omits several inconsistencies that cast doubt on Plaintiff's asserted timeline. (*See, e.g.*, Doc. 195-1 at 43:8-44:18 (conceding that he did not include in his report text messages that controvert Plaintiff's asserted timeline).) In fact, Dr. Lyman conceded in his deposition that several facts on which he based his opinion were "not correct"—that is, he concedes his opinion relied on untrue or misstated facts. (*Id.* at 91:11-16.) Together, these errors create considerable doubt as to the reliability of Dr. Lyman's opinion and lead the Court to conclude that it must be stricken on that basis.

Further, the Court has already found, based on the specific actions actually taken by the Police Defendants in this case, that the investigation was not unconstitutional. Dr. Lyman's opinion that the Police Defendants failed to meet the theoretical standard for investigations is of little relevance in light of that finding. Said differently, the Court's § 1983 analysis need not rely on theory and best practices when it can consider the Defendants' actual conduct.

### III. GEOFFREY R. LOFTUS – *Eyewitness Identifications*

Plaintiff intends to present the testimony of Dr. Loftus, "a professor of psychology at the University of Washington and widely-published and globally-recognized expert in the field of human perception and memory," *People v. Lerma*, 47 N.E.3d 985, 990 (Ill. 2016), to show that eyewitness identifications are nor reliable. Defendants do not challenge Dr. Loftus's qualifications but move to exclude his testimony on perception and memory on the ground that it will not assist the trier-of-fact. (Doc. 202.) Defendants specifically argue that Dr. Loftus intends to testify about "commonsense factors a jury can consider on its own with any guidance from an expert." (*Id*. at 3.) In addition, Defendants assert that Dr. Loftus's intended testimony invades the jury's role in assessing credibility. (*Id*. at 3-4.)

Dr. Loftus's opinion, like Dr. Lyman's, is based largely on theory and practice and not on the facts of this case and it does not alter the Court's summary judgment analysis. While his opinion as to the weight and credibility of eyewitness identifications might help contextualize the Circuit Attorney's charging decision, it does not illustrate that the Police Defendants' investigation was flawed. Put simply, whether eyewitness identifications may be prone to mistake does not assist the trier-of-fact in determining whether the Police Detectives conducted a constitutional investigation in this case.

For these reasons, the Court will grant Defendants' motions to exclude Plaintiff's experts' opinions and testimony.

Accordingly,

**IT IS HEREBY ORDERED** that the Motion for Summary Judgment filed by the Police and Board Defendants (Doc. 182), is **GRANTED.**

**IT IS FURTHER ORDERED** that the Motion for Summary Judgment filed by Spence (Doc. 196), is **GRANTED.**

**IT IS FURTHER ORDERED** that the Motion for Summary Judgment filed by the City (Doc. 198), is **GRANTED.**

**IT IS FINALLY ORDERED** that the Joint Motions to Exclude the Expert Testimony of Stan V. Smith (Doc. 189), Michael D. Lyman (Doc. 190), and Geoffrey R. Loftus (Doc. 201), are **GRANTED.**

A separate Judgment will accompany this Memorandum and Order.

Dated this 31st Day of March, 2019.

_____
JOHN A. ROSS
UNITED STATES DISTRICT JUDGE